CITY OF NEW YORK, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 27960–92B.        Filed October 11, 1994.

482

*James S. Kaplan, Helene Jaffa, Robert Firestone,* and *Amy F. Nogid,* for petitioner.

*Marsha A. Keyes, Rebecca L. Caldwell-Harrigal,* and *Richard L. Carlisle,* for respondent.

## OPINION

HAMBLEN, *Chief Judge:* This is an action for declaratory judgment pursuant to section 7478.[1] Petitioner requested respondent to rule that general obligation bonds (bonds) in the face amount of $100 million that petitioner proposes to issue will be obligations described in section 103(a), so that the interest thereon will be excludable from the bondholders' gross income. After administrative review, respondent denied petitioner's request on the grounds that the proposed bonds are private activity bonds within the meaning of section 141(a)(2).

All of the jurisdictional requirements for a declaratory judgment action have been satisfied. See Rule 210(c). The burden of proof is on petitioner, see Rule 217(c)(2)(A), and our decision is based upon the administrative record and the parties' stipulation of facts. See Rule 217(a). We accept as true those facts represented in the administrative record and the parties' stipulation of facts. See Rule 217(b)(1). Only those facts necessary to our decision are set forth.

The issue for decision is whether the proposed bonds are obligations described in section 103(a). Resolution of this

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code of 1986 as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.

issue depends on whether the bonds are private activity bonds under the private loan financing test of section 141(c). For the reasons set forth below, we agree with respondent that the proposed bonds are private activity bonds. Accordingly, we hold that the proposed bonds are not obligations described in section 103(a).

## Background

Petitioner City of New York (hereinafter petitioner or the city) is a municipal corporation of the State of New York. In order to combat the deterioration of much of its housing stock in low and moderate income neighborhoods, petitioner has developed a variety of programs. The six such programs involved in the present case are referred to as the programs.[2]

Petitioner proposes to issue bonds with a total face amount of $100 million. Petitioner will use $15 million of the bond proceeds to finance the programs. Petitioner will apply the remaining $85 million to projects that have no private use.

The $15 million of bond proceeds earmarked for the programs will be advanced by petitioner in the form of loans (advances). No portion of the advances is structured as a grant. Although the specific structure of the advances varies with each program, all the advances share several common characteristics. The advances will be made to homeowners, groups of homeowners, private developers, or court-appointed administrators (collectively, the borrowers), who will use the proceeds to renovate either city-owned or privately owned buildings. All the advances must be repaid to the city over a fixed term (generally 30 years), and bear interest at below-market rates. All advances must be repaid in full by the borrowers, and no portion of the advances will be forgiven. In order to ensure that the purposes of the programs are achieved, borrowers must comply with various city-imposed restrictions on the operation of the buildings, such as rent guidelines.

As the foregoing indicates, two relevant financial transactions are contemplated: (1) The city will receive $100 million pursuant to the bond issue, and (2) the city will transfer

---

[2] The six programs involved in the present case are the Urban Homesteading Program, the Article 8A Program, the Vacant Building Program, the Participation Loan Program, the SRO Program For-Profit Developers, and the Article 7A Program.

$15 million of the bond proceeds to the borrowers pursuant to the advances. Because the bonds will be general obligation bonds, repayment of the bonds will be made from the city's general revenues. The city will be solely responsible for the payments to the bondholders, and the bondholders will not receive any security interest in the borrowers' repayments of the advances to the city or in the buildings being renovated under the programs.

The actual yield on the bonds will be determined by a bid process. For purposes of its ruling request, petitioner represented that the yield on the bonds will equal 8.5 percent per annum. In contrast, the interest rate on the outstanding advances will range from 0 to 3 percent per annum. The present value of all the payments that the city will receive from the borrowers in repayment of the advances, discounted at the assumed 8.5-percent yield on the bonds, equals $4,789,324, which is less than the $15 million principal amount of the advances.

## Contentions of the Parties

Section 103(a)[3] provides generally that gross income does not include interest on any State or local bond. The city is a political subdivision of the State of New York, and the proposed bonds will be obligations of the city. Accordingly, the proposed bonds fall within the general rule of section 103(a). See sec. 103(c)(1). Section 103(a), however, is qualified by the exceptions contained in section 103(b).

In denying petitioner's ruling request, respondent relied on the exception set forth in section 103(b)(1), which provides that the general rule of section 103(a) does not apply to "Any private activity bond which is not a qualified bond (within the meaning of section 141)."[4] Section 141(a) defines a "pri-

---

[3] The relevant part of sec. 103 provides:

SEC. 103. INTEREST ON STATE AND LOCAL BONDS

(a) EXCLUSION.—Except as provided in subsection (b), gross income does not include interest on any State or local bond.

(b) EXCEPTIONS.—Subsection (a) shall not apply to—

(1) PRIVATE ACTIVITY BOND WHICH IS NOT A QUALIFIED BOND.—Any private activity bond which is not a qualified bond (within the meaning of section 141).

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) DEFINITIONS.—For purposes of this section and part IV—

(1) STATE OR LOCAL BOND.—The term "State or local bond" means an obligation of a state or political subdivision thereof.

[4] Petitioner does not contend that the proposed bonds are "qualified bonds" within the mean-

vate activity bond" as any bond that is part of an issue that meets either: (1) The private business tests of section 141(b), or (2) the private loan financing test of section 141(c). Respondent contends that the proposed bonds are private activity bonds by reason of the private loan financing test of section 141(c), which provides in relevant part as follows:

SEC. 141(c). PRIVATE LOAN FINANCING TEST.—

(1) IN GENERAL.—An issue meets the test of this subsection if the amount of the proceeds of the issue which are to be used (directly or indirectly) to make or finance loans * * * to persons other than governmental units exceeds the lesser of—

(A) 5 percent of such proceeds, or
(B) $5,000,000.

The parties agree that the borrowers under the programs are "persons other than governmental units". Accordingly, if the amount of bond proceeds that is used to make or finance loans under the programs exceeds $5 million,[5] the bonds will meet the private loan financing test and will constitute private activity bonds, the interest from which will not . be excludable from the bondholders' gross income.

The parties' disagreement centers on the proper measurement of the amount of bond proceeds that will be used "to make or finance loans" within the meaning of section 141(c). According to respondent, the full $15 million of bond proceeds that will be used to fund the advances will be used to make or finance loans to the borrowers, thereby causing the proposed transaction to exceed the $5 million private loan financing test threshold. Respondent bases her argument on the fact that the advances are structured as loans and the borrowers are required to repay the advances in full over a fixed time period.

Petitioner concedes that the advances are structured as loans and that the $15 million face amount of the advances exceeds the section 141(c) private loan financing threshold. Petitioner, however, argues that the $15 million face amount of the advances is not the proper measurement of the amount of bond proceeds that will be used to "to make or

---

ing of sec. 141(e). Accordingly, if the bonds are private activity bonds, they fall within the exception of sec. 103(b)(1).

[5] Because the amount of proposed bond proceeds equals $100 million, the private loan financing test threshold equals $5 million under both the 5-percent test of sec. 141(c)(1)(A) and the specific dollar limitation of sec. 141(c)(1)(B).

finance loans" under section 141(c). Instead, petitioner contends that the advances, despite being structured in full as loans, consist of two distinct economic components: (1) A loan from the city to the borrowers, and (2) a grant from the city to the borrowers. Petitioner contends that only the amount of the loan component is relevant for purposes of the section 141(c) private loan financing test.

Petitioner bases this bifurcation argument on the fact that the city allows the borrowers to repay the advances at interest rates below the market rate reflected in the yield on the bonds. Petitioner argues that the loan component of the advances equals the present value of the repayments the borrowers must make on the advances, discounted at the assumed 8.5-percent market rate yield on the bonds. Under this formula, the amount of bond proceeds that will be used to make or finance loans equals $4,789,324, which is below the $5 million private loan financing test threshold of section 141(c).[6] The remaining $10,210,676 ($15 million − $4,789,324) of the advances, according to petitioner, constitutes a grant from the city to the borrowers that is not subject to the private loan financing test.[7]

## *Discussion*

### 1. *In General*

The present case centers on the proper interpretation of the private loan financing test of section 141(c). Specifically, we must decide whether section 141(c) permits petitioner to use present value discounting methods to calculate the amount of bond proceeds "which are to be used (directly or indirectly) to make or finance loans".

As a preliminary matter, we note that this Court has previously addressed the general applicability of time value of money principles under the Code. In *Follender v. Commissioner,* 89 T.C. 943 (1987), respondent attempted to apply

---

[6] If the actual yield on the bonds is less than the assumed 8.5-percent rate, it is possible that the present value of the repayments on the advances will exceed $5 million. Under such circumstances, the bonds would fail to meet the private loan financing test of sec. 141(c) even if we were to accept petitioner's bifurcation argument.

[7] Respondent concedes that sec. 141(c) does not prevent municipalities from making grants. Accordingly, were we to accept petitioner's bifurcation theory, the grant portion of the advances would not be counted in calculating whether the private loan financing test threshold is exceeded.

time value of money principles to the calculation of the "borrowed amount" under section 465(b)(2), thereby reducing the amount the taxpayer had "at risk" under the rules of section 465. After observing that "The concept of the time value of money is * * * relatively new to the Code", we concluded that time value of money concepts can be applied only in the presence of a legislative directive to do so. *Follender v. Commissioner, supra* at 950, 952. Because we found that section 465 "does not allow for present value calculations, expressly or implicitly", we rejected respondent's position. *Id.* at 952.

Petitioner contends that the present case is distinguishable from *Follender*. Petitioner concedes that, like the statute at issue in *Follender,* there is no specific statutory language in section 141(c) that supports the use of time value of money principles. Instead, petitioner bases its argument on: (1) The legislative history and statutory purpose of section 141(c); and (2) the use of time value of money concepts in certain other areas of Federal tax law. For the reasons set forth below, we find each of these arguments unpersuasive, and we decline petitioner's invitation to graft time value of money concepts onto the private loan financing test of section 141(c).

## 2. *Legislative History and Purpose*

Petitioner contends that the primary purpose of section 141(c) and its predecessor is to restrict "conduit financing" in which public issuers use their ability to issue tax-exempt debt to benefit private persons, rather than legitimate municipal purposes. Petitioner engages in a detailed economic analysis of the below-market nature of the advances, concluding that the private borrowers under the advances receive the economic benefit of petitioner's ability to issue tax-exempt debt only to the extent that the borrowers pay down the municipality's debt at the favorable tax-exempt rate (i.e., to the extent of the present value of the repayments of the advances discounted at the anticipated yield on the bonds). Petitioner argues that the difference between the face amount of the advances and the discounted present value of the repayments constitutes an implicit grant by the city in furtherance of the public purpose of providing afford-

able housing, and is not the type of conduit financing that Congress sought to restrict under section 141(c).

Although petitioner's analysis might be an appealing interpretation of the transaction based on economic theory, we do not believe that it is apposite for purposes of the statute before us. As the following analysis demonstrates, Congress enacted detailed statutory provisions to determine when a bond issuance that benefits both private and public interests is entitled to tax-exempt status. While petitioner is correct in asserting that the prevention of conduit financing was a significant concern of Congress in enacting these provisions, the method Congress chose to address this problem does not support petitioner's use of time value of money concepts to bifurcate the advances into a loan portion and an implicit grant portion.

## A. *Statutory Language*

As an initial step in addressing petitioner's argument, we must look to the statutory language of section 141(c). As the Supreme Court observed: "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 543 (1940).

Section 141(c) does not contain a specific method for calculating the amount of bond proceeds used "to make or finance loans". Accordingly, we look to the words of the statute as ordinarily understood. See *Commissioner v. Brown,* 380 U.S. 563, 570–571 (1965); *Lenz v. Commissioner,* 101 T.C. 260, 265 (1993); *Union Pac. Corp. v. Commissioner,* 91 T.C. 32, 38 (1988). The term "loan" is commonly defined as the "Delivery by one party to and receipt by another party of sum of money upon agreement, express or implied, to repay it with or without interest." Black's Law Dictionary 936 (6th ed. 1990). This definition is consistent with our prior decisions in other contexts, in which a transaction has been held to be a loan if there is an unconditional obligation to repay a sum certain at a fixed or other maturity date. See *Adams v. Commissioner,* 58 T.C. 41, 58–59 (1972); *New England Tank Indus., Inc. v. Commissioner,* 50 T.C. 771, 777 (1968), affd. 413 F.2d 1038 (1st Cir. 1969).

Under this general definition, the full $15 million of advances constitutes loans. All the advances must be repaid by the borrowers to the city over a fixed term, and no portion of the advances will be forgiven. Moreover, the advances are structured as loans under the detailed written documentation between petitioner and each borrower. The fact that the advances carry a beneficial rate of interest does not, in our opinion, prevent the advances from being loans under the common definition of the term. Accordingly, under the ordinary meaning of the statutory language, the $15 million of bond proceeds that is used to fund the advances will exceed the $5 million private loan financing threshold of section 141(c).

### B. *Statutory Purpose*

It is well established that we may look to the legislative history of a statute where the statute is ambiguous. *Texaco Inc. & Subs. v. Commissioner*, 101 T.C. 571, 575 (1993); *Centel Communications Co. v. Commissioner*, 92 T.C. 612, 627–628 (1989), affd. 920 F.2d 1335 (7th Cir. 1990); *U.S. Padding Corp. v. Commissioner*, 88 T.C. 177, 184 (1987), affd. 865 F.2d 750 (6th Cir. 1989). Even where the statutory language appears clear, we may seek out any reliable evidence as to legislative purpose. *United States v. American Trucking Associations, Inc., supra* at 543–544; *United States Padding Corp. v. Commissioner, supra* at 184; *Huntsberry v. Commissioner*, 83 T.C. 742, 747–748 (1984). However, where a statute appears clear on its face, we require unequivocal evidence of legislative purpose before construing the statute so as to override the plain meaning of the words used therein. *Huntsberry v. Commissioner, supra* at 747–748.

The first limitations on the use of tax-exempt bond proceeds to make personal loans were contained in section 103(o) of the Internal Revenue Code of 1954 (1954 Code), which was enacted by the Deficit Reduction Act of 1984 (DRA 1984), Pub. L. 98–369, sec. 626, 98 Stat. 926. That section denied the tax-exclusion benefits of section 103(a) of the 1954 Code to interest on "private loan bonds".[8] The Senate

---

[8] As originally enacted, sec. 103(o) used the term "consumer loan bond". See Deficit Reduction Act of 1984 (DRA 1984), Pub. L. 98–369, sec. 626, 98 Stat. 926. The Tax Reform Act of 1986, Pub. L. 99–514, sec. 1869, 100 Stat. 2888, changed the term "consumer loan bond" to "private

Finance Committee report states that section 103(o) was enacted because of concern "about the growing use of tax-exempt bonds to finance loans for personal expenses of higher education * * * and the possible use of 'tax-exempt bonds to finance other personal loans." S. Rept. 98–169 (Vol. 1), at 706 (1984). The report explained the provisions of the new statute as follows:

> The bill generally denies tax-exemption for interest on consumer loan bonds, which are defined as obligations five percent or more of the proceeds of which are to be used directly or indirectly to make loans to persons other than exempt persons. * * * Loans to enable a borrower to finance any tax or governmental assessment of general application for an essential government function are not taken into account. In addition, consumer loan bonds do not include IDBs [Industrial Development Bonds], qualified mortgage bonds and qualified student loan bonds. [*Id.* at 707.]

The Tax Reform Act of 1986 (TRA 1986), Pub. L. 99–514, sec. 1301(b), 100 Stat. 2605, increased the restrictions on private loan financing. These new restrictions were codified as section 141(c).[9] The conference committee report noted that "the [private loan financing] restriction applies to loans to all persons other than governmental units", and observed that the revised statute "retains the present-law exceptions to the private loan restriction for all private activity bonds for which tax-exemption is provided specifically in the Code". H. Conf. Rept. 99–841, at II–692 (1986), 1986–3 C.B. (Vol. 4) 1, 692.

As the foregoing committee reports illustrate, Congress was concerned about the use of tax-exempt bonds as a conduit to finance personal loans. However, Congress realized that certain loans to private persons further important public purposes and therefore should not jeopardize the tax-exempt status of the bond issue. In striking a balance between these concerns, Congress chose to concentrate the initial inquiry on the identity of the recipient of the loans, rather than the purposes served by the loans. As a result, the private loan

---

loan bond", retroactive to the effective date of DRA 1984. The term "private loan bond" was defined generally as "any obligation which is issued as part of an issue all or a significant portion of the proceeds of which are reasonably expected to be used directly or indirectly to make or finance loans * * * to persons who are not exempt persons". Sec. 103(o), I.R.C. 1954.

[9] As part of the Tax Reform Act of 1986, the tax-exempt interest rules contained in secs. 103 and 103A of the 1954 Code were reorganized, by topic, into 11 separate Code sections (secs. 103 and 141–150 of the Internal Revenue Code of 1986). H. Conf. Rept. 99–841, at II–686 (1986), 1986–3 C.B. (Vol. 4) 1, 686.

financing test of section 141(c)(1) focuses on whether the loan recipients are nongovernmental persons rather than the purposes for which the loan recipients are borrowing the money.

The statutory inquiry turns to the purpose of the loan only after it is determined that the private loan financing test of section 141(c)(1) is met, thereby causing the bonds to be private activity bonds under section 141(a)(2). Sections 142 through 147 contain the explicit requirements that must be satisfied in order for a private activity bond to be eligible for tax-exempt status based on the public purpose served.[10] As the TRA 1986 conference committee report makes clear, the exceptions to the private loan restrictions based on the public purpose served apply only when a "tax-exemption is provided specifically in the Code". H. Conf. Rept. 99–841, *supra* at II–692, 1986–3 C.B. (Vol. 4) at 692.

Petitioner's bifurcation argument, which focuses at the outset on the purposes served by the advances, is inconsistent with this two-step statutory approach that Congress enacted to limit conduit financing. Because the borrowers under the proposed transactions are not governmental units, the full amount of the advances falls within the scope of section 141(c)(1), which focuses solely on the identity of the borrower. Moreover, the proposed bonds do not constitute qualified private activity bonds under section 141(e), and therefore are not entitled to tax-exempt status based on the purported public purpose served by the advances. To allow petitioner to apply time value of money concepts under section 141(c) to separate the "private" loan portion of the advances from the "public" grant portion of the advances would undermine the specific choices Congress made in deciding which loans that benefit both private and public purposes should be eligible for tax-exempt status.

### C. *Substance Over Form*

Petitioner also cites the following paragraph from the conference committee report on the Tax Reform Act of 1986:

The conferees intend that, as under present law, a loan may arise from the direct lending of bond proceeds or may arise from transactions in

---

[10] Those bond issues that meet one of the specific statutory exceptions are referred to as "qualified" private activity bonds, and, unlike other private activity bonds, the interest thereon is tax-exempt. See secs. 103(b)(1), 141(e).

which indirect benefits that are the economic equivalent of a loan are conveyed. Thus, *the determination of whether a loan is made depends on the substance of a transaction, as opposed to its form.* For example, a lease or other contractual arrangement (e.g., a management contract or an output or take-or-pay contract) may in substance constitute a loan, even if on its face such an arrangement does not purport to involve the lending of bond proceeds. However, a lease or other deferred payment arrangement with respect to bond-financed property that is not in form a loan of bond proceeds generally is not treated as such unless the arrangement transfers tax ownership to a nongovernmental person. Similarly, an output or management contract with respect to a bond-financed facility generally is not treated as a loan of bond proceeds unless the agreement in substance shifts significant burdens and benefits of ownership to the purchaser or manager of the facility. [H. Conf. Rept. 99–841, *supra* at II–692, 1986–3 C.B. (Vol. 4) at 692; emphasis added.]

Petitioner argues that the reference to substance over form in the committee report applies not only to recharacterize as a loan a transaction that is not structured as such, but also to determine that a portion of a transaction is not a loan even when the full transaction is structured as a loan. As applied to the facts of the present case, petitioner contends that the emphasized language mandates that we ignore the fact that the advances are structured in full as loans and that we look to the purported economic substance of the transaction using time value of money principles.

We are not persuaded that the emphasized language, taken in the context of the full quoted paragraph, supports petitioner's contention. A more reasonable interpretation of the paragraph indicates that Congress intended that section 141(c) be broadly construed to capture transactions that are in substance loans, even if they are not structured as loans. The emphasized reference to substance over form underscores Congress' concern, expressed in the first sentence of the excerpt, that section 141(c) be applied to all "transactions in which indirect benefits that are the economic equivalent of a loan are conveyed." The examples given in the quoted paragraph further demonstrate that Congress was concerned with broadening, rather than limiting, the potential scope of section 141(c). When analyzed in this context, the emphasized language supports the extension of section 141(c) to transactions, such as certain leases, management contracts, or take-or-pay contracts, that are disguised as something other than loans. It provides no support for petitioner's use

of time value of money concepts to reduce the amount of advances that is subject to the private loan financing test.

We note that our interpretation of the conference report language is consistent with the prior decisions of this Court holding that a taxpayer generally may not invoke the substance over form principle to disavow the form in which he has structured a transaction. See *Estate of Durkin v. Commissioner,* 99 T.C. 561, 571–574 (1992); *Coleman v. Commissioner,* 87 T.C. 178, 201–204 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987). This principle has also been adopted by the Supreme Court, which stated in *Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 149 (1974):

This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not. "To make the taxability of the transaction depend upon the determination whether there existed an alternative form which the statute did not tax would create burden and uncertainty." [Citations omitted.]

Similarly, "It would be quite intolerable to pyramid the existing complexities of tax law by a rule that the tax shall be that resulting from the form of transaction taxpayers have chosen or from any other form they might have chosen, whichever is less." *Television Indus., Inc. v. Commissioner,* 284 F.2d 322, 325 (2d Cir. 1960), affg. 32 T.C. 1297 (1959).

Although this Court in certain circumstances permits a taxpayer to disavow the structure of his transaction upon a showing of "strong proof" that the transaction does not reflect economic reality, see *Estate of Durkin v. Commissioner, supra* at 572–573; *Coleman v. Commissioner, supra* at 202–203, petitioner has not met this burden.[11] As discussed above, the advances constitute loans as commonly defined. The city is entitled to an unconditional repayment of the advances over a fixed period. The fact that the interest accruing on the outstanding advances is below the market rate

---

[11] We also note that the reasons for allowing petitioner to disavow the form of its transaction appear less clear in the present declaratory judgment action, since petitioner has not yet carried out the proposed transaction and is therefore in a position to change its structure.

does not, in our opinion, constitute "strong proof" that the loan structure does not reflect economic reality.

### 3. *Use of Time Value of Money Concepts in Other Areas of Tax Law*

Petitioner also contends that its use of time value of money principles under section 141(c) is supported by the use of these concepts in purportedly analogous statutes, cases and rulings in other areas of tax law. As specific support for this argument, petitioner cites: (A) Sections 1274 and 7872; (B) the Supreme Court decision in *Dickman v. Commissioner,* 465 U.S. 330 (1984); and (C) section 141(b)(2), as interpreted by respondent's Notice 87–69, 1987–2 C.B. 378. After analyzing these examples, as well as related cases and rulings cited by petitioner, we find that they do not support the use of time value of money principles under section 141(c).

### A. *Sections 1274 and 7872*

Petitioner argues that a statutory trend in favor of the application of time value of money concepts existed at the time the predecessor to section 141(c) was enacted, and that this trend should influence our interpretation of section 141(c). In support of this assertion, petitioner notes that the Deficit Reduction Act of 1984 (DRA 1984), Pub. L. 98–369, 98 Stat. 494, which contained the predecessor to section 141(c), also enacted sections 1274 and 7872, which specifically incorporate time value of money principles. Section 1274, which is a part of the "original issue discount" rules of the Code, uses present value discounting calculations to determine the imputed principal amount of certain debt instruments issued in exchange for property. Sec. 1274(b). This calculation is necessary in order to determine the amount of imputed interest the debtholder must ratably include in his gross income under section 1272 and the issuer may deduct under section 163(e). Section 7872 applies time value of money principles to determine the gift tax and income tax consequences of certain loans with below-market interest rates.

Petitioner does not contend that section 1274 or section 7872 directly applies to the present case.[12] Instead, peti-

---

[12] Sec. 1.7872–5(b)(5), Proposed Income Tax Regs., 50 Fed. Reg. 33561 (Aug. 20, 1985), promulgated pursuant to the legislative authority of sec. 7872(h)(1)(C), specifically exempts from

tioner argues that "Because of the extensive attention paid by Congress to time value of money issues at the time section 141(c) was enacted, it is not likely that Congress would have intended such principles to be ignored when it extended the private lending limitation of Section 103(o) of the 1954 Code." Petitioner further argues, without citing any specific authority, that the use of time value of money principles under section 1274 and section 7872 creates a "strong presumption that Congress intended to apply these concepts to below-market interest advances under section 141(c), absent compelling evidence to the contrary." Although petitioner correctly notes that Congress enacted several statutory provisions during the early 1980s that specifically incorporate time value of money concepts, we disagree with the conclusion petitioner draws regarding the applicability of this statutory trend to section 141(c).

As discussed above, this Court has previously addressed the inferences to be drawn from the explicit use of time value of money concepts in certain sections of the Code, including those sections enacted by DRA 1984. In *Follender v. Commissioner,* 89 T.C. 943, 952 (1987), after noting that "The concept of the time value of money is * * * relatively new to the Code," we reasoned that the use of time value of money concepts in specific statutes demonstrates that "Congress has been explicit in the areas it has chosen to require present value calculations." Because the statute at issue in that case, section 465(b)(2), "does not allow for present value calculations, expressly or implicitly", we held that time value of money principles could not be imputed. *Id.*

Following the reasoning set forth in *Follender,* we find that the explicit use of time value of money principles in certain sections enacted by DRA 1984 (e.g., sections 1274 and 7872), coupled with the absence of any such use in section 141(c), the predecessor of which was also enacted by DRA 1984, belies petitioner's argument that Congress intended to apply time value of money concepts to section 141(c). Sections 1274 and 7872 illustrate that Congress knows how to incorporate time value of money concepts into a statute when it so

---

the scope of sec. 7872 "Loans subsidized by the Federal, State (including the District of Columbia), or Municipal government (or any agency or instrumentality thereof), and which are made available under a program of general application to the public." Petitioner does not challenge the validity of this proposed regulation.

desires. Had Congress chosen to apply these concepts to section 141(c), it is reasonable to assume that it would have explicitly included them in the statutory language, as was done in sections 1274 and 7872. Cf. *Badaracco v. Commissioner,* 464 U.S. 386, 395 (1984) (Supreme Court refused to interpret section 6501(c)(1) as a mere tolling of the period for assessing income tax, reasoning that "When Congress intends only a temporary suspension of the running of a limitations period, it knows how unambiguously to accomplish that result.").

## B. *Dickman v. Commissioner*

Petitioner also cites the Supreme Court decision in *Dickman v. Commissioner,* 465 U.S. 330 (1984), for the proposition that time value of money principles must be applied under section 141(c) even in the absence of a specific directive in the statute or legislative history. We disagree with petitioner's broad reading of that case.

In *Dickman,* the Supreme Court held that a father's interest-free demand loans to his son and a closely held family corporation resulted in taxable gifts of the reasonable value of the use of the money loaned.[13] *Id.* at 344. In that case, respondent determined the value of the gifts by multiplying the loan balances outstanding at the end of each calendar quarter by the interest rate payable on underpayments of tax under section 6621. *Id.* at 332 n.2. The holding in the *Dickman* case was subsequently incorporated into section 7872.[14]

Contrary to petitioner's contention, the Supreme Court's reasoning in *Dickman v. Commissioner, supra,* does not mandate a broad, indiscriminate application of time value of money principles across all areas of the Internal Revenue Code. The decision was based on the Court's detailed analysis of the statutory language and legislative purpose underly-

---

[13] As petitioner notes in its detailed analysis of the cases leading up to the Supreme Court's decision in *Dickman v. Commissioner,* 465 U.S. 330 (1984), most courts, including this one, had previously held that interest-free demand loans of the type in *Dickman* did not result in a taxable gift. See, e.g., *Dickman v. Commissioner,* T.C. Memo. 1980–575, revd. and remanded 690 F.2d 812 (11th Cir. 1982), affd. 465 U.S. 330 (1984); *Crown v. Commissioner,* 585 F.2d 234 (7th Cir. 1978), affg. 67 T.C. 1060 (1977).

[14] The coverage of sec. 7872 extends beyond the holding in *Dickman v. Commissioner, supra.* Whereas *Dickman* addressed the gift tax consequences of a below-market demand loan, sec. 7872 also covers the gift tax consequences of below-market term loans and certain income tax consequences of below-market loans.

ing the Federal gift tax provisions at issue. See *Winter v. United States,* 23 Cl. Ct. 758, 762 (1991), affd. without published opinion 972 F.2d 1355 (Fed. Cir. 1992) (refusing to apply *Dickman* time value of money principles to income tax deductions because "the holding in *Dickman* is grounded squarely on the statutory language of section 2501"). The Court's analysis revealed that Congress intended to interpret the gift tax provisions in the broadest and most comprehensive sense in order to reach all transfers of property and property rights having significant value. *Dickman v. Commissioner, supra* at 334. Moreover, the Court reasoned that to impose the gift tax on interest-free loans would further "one of the major purposes of the federal gift tax statute: protection of the estate tax and the income tax." *Id.* at 338.

The reasoning in *Dickman* indicates that, absent specific statutory authorization, the use of time value of money principles is appropriate when necessary to effectuate a clearly stated legislative purpose. As discussed in detail above, neither the language of section 141(c) nor its legislative history supports the use of time value of money principles. The committee reports show that Congress was concerned with limiting the amount of loans that can be made to nongovernmental persons. For example, in providing that substance over form should control, the conference committee report highlights Congress' desire that the term "loan" be broadly interpreted, so that a wide variety of transactions that are not structured as loans will nevertheless be subject to the private loan financing test. See H. Conf. Rept. 99–841, at II–692 (1986), 1986–3 C.B. (Vol. 4) 692. In sharp contrast to this stated purpose of broadening the scope of section 141(c), petitioner's use of time value of money concepts would narrow the definition of transactions that would be subject to the private loan financing test.

In a related argument, petitioner cites respondent's Rev. Rul. 73–61, 1973–1 C.B. 408. That ruling, involving facts similar to those in *Dickman,* held that non-interest-bearing loans between a father and his son resulted in taxable gifts.[15] Petitioner contends that respondent's use of time

---

[15] Whereas *Dickman v. Commissioner, supra,* involved only the gift tax treatment of demand loans, Rev. Rul. 73–61, 1973–1 C.B. 408, addressed the gift tax treatment of both demand loans and term loans. As in *Dickman,* the ruling valued the gift arising from an interest-free demand

value of money principles in Rev. Rul. 73–61, *supra,* which was validated by the holding in *Dickman v. Commissioner, supra,* binds respondent to use those principles in the present case. For the same reasons that we rejected petitioner's argument concerning the applicability of *Dickman v. Commissioner, supra,* we reject petitioner's argument concerning Rev. Rul. 73–61, *supra.* Petitioner attempts to blindly apply principles from one area of tax law to another area, without regard to the reasoning underlying those principles. The application of time value of money concepts in the revenue ruling, as well as in *Dickman,* was based on the specific statutory purposes underlying the gift tax provisions at issue. See Rev. Rul. 73–61, 1973–1 C.B. at 408–409. In contrast, as discussed above, the statutory purposes underlying section 141(c) do not warrant the use of time value of money principles.

### C. *Section 141(b)(2) and Notice 87–69*

As discussed above, a bond constitutes a "private activity bond" if it meets either: (1) The private loan financing test of section 141(c), which is at issue here, or (2) the private business tests of section 141(b). Sec. 141(a). A bond issue meets the private business tests of section 141(b) if it meets both: (1) The private business use test of section 141(b)(1), and (2) either the private security test of section 141(b)(2)(A) or the private payment test of section 141(b)(2)(B).[16] In Notice 87–69, 1987–2 C.B. 378, respondent indicated that

---

loan based on the balance of the loan outstanding at the end of each calendar quarter. The ruling valued the gift arising from an interest-free term loan by determining the discounted present value of the foregone interest at the time the loan was made. Because the advances are repayable over specific periods of time, petitioner relies heavily on the present value discounting method applied to the term loan in the ruling.

[16] The relevant part of sec. 141(b) provides:

SEC. 141(b). PRIVATE BUSINESS TESTS.—

(1) PRIVATE BUSINESS USE TEST.—Except as otherwise provided in this subsection, an issue meets the test of this paragraph if more than 10 percent of the proceeds of the issue are to be used for any private business use.

(2) PRIVATE SECURITY OR PAYMENT TEST.—Except as otherwise provided in this subsection, an issue meets the test of this paragraph if the payment of the principal of, or the interest on, more than 10 percent of the proceeds of such issue is (under the terms of such issue or any underlying arrangement) directly or indirectly—

    (A) secured by any interest in—

        (i) property used or to be used for a private business use, or

        (ii) payments in respect of such property, or

    (B) to be derived from payments (whether or not to the issuer) in respect of property, or borrowed money, used or to be used for a private business use.

time value of money principles are to be used for purposes of applying the private payment test of section 141(b)(2)(B). Although petitioner concedes that the private payment test of section 141(b)(2)(B) does not apply directly to the present case, it contends that the time value of money principles implicit in that test apply, by analogy, to the private loan financing test of section 141(c). We disagree.

In general, the private payment test of section 141(b)(2)(B) is satisfied if the payment of the principal of, or the interest on, more than 10 percent of the proceeds of a bond issue is, directly or indirectly, derived from payments in respect of property, or borrowed money, used or to be used for a private business use. Sec. 141(b)(2). This test presents a peculiar problem in that it requires a comparison of two different streams of income: (1) The payments of debt service on the bonds and (2) the payments generated by property or borrowed money. These payment streams could have vastly different repayment terms, such as the period of time over which payments are made, the rate of interest on the outstanding balances, and the extent to which the outstanding principal is either amortized over the life of the debt or is payable in a single balloon payment. Without some common method of valuing these two streams, the comparison mandated by section 141(b)(2) would be useless. Notice 87–69, *supra,* by requiring the comparison of the present values of the two income streams, provides such a method.[17]

The use of time value of money concepts under section 141(b)(2) is consistent with our reasoning in *Follender v. Commissioner,* 89 T.C. 943, 952 (1987), that such principles should not be applied unless the statute provides for them, either expressly or implicitly. Congress, by statutorily requiring a comparison of potentially different income streams, implicitly sanctioned the use of a method for making the comparison meaningful. As in *Dickman v. Commissioner,* 465 U.S. 330 (1984), time value of money concepts constitute a permissible tool for effectuating congressional intent.

This rationale, however, does not extend to the private loan financing test of section 141(c). As noted several times above, nothing in the statutory structure or legislative his-

---

[17] Notice 87–69, 1987–2 C.B. 378, in recognition of the unique necessity of a comparison of income streams under the private payment test, explicitly limits the application of its present value analysis to the private payment test of sec. 141(b)(2)(B). Notice 87–69, 1987–2 C.B. at 379.

tory of section 141(c) mandates the use of time value of money principles. Unlike the streams of payments involved in section 141(b)(2)(B), section 141(c) merely requires the comparison of two absolute dollar amounts: (1) The "amount of the proceeds" of the issue that are used to make or finance loans, and (2) the lesser of 5 percent of the proceeds or $5 million. Accordingly, the present value discounting principles used in section 141(b)(2)(B) are not necessary to carry out the mathematical test required by section 141(c).

For the foregoing reasons, we hold that the advances may not be bifurcated, using time value of money principles, into a loan portion and a grant portion for purposes of the private loan financing test of section 141(c). Because the entire $15 million principal amount of the advances constitutes a loan for purposes of the test, the $5 million private loan financing test threshold of section 141(c) is exceeded. Accordingly, the bonds constitute private activity bonds under section 141(a)(2), and the interest thereon is not excludable from the bondholders' gross income under section 103(a).

As a final observation, we recognize that the proposed transactions were designed to alleviate significant public problems faced by the city. We emphasize that our decision is not intended as a rebuke of the city's efforts to address these important issues and is not based on the underlying merits of the programs. Rather, our holding is a result of a straightforward application of the test provided by section 141(c). Congress, if it desires to do so, has the power to revise the requirements of section 141(c) to permit the adoption of the proposed transactions, either by raising the specific dollar limitation in the private loan financing test or by explicitly incorporating time value of money principles into the test. Alternatively, as petitioner conceded at oral argument, the city could restructure the proposed transactions to explicitly separate the intended grant amount from the loan transaction. Unless and until such changes are made, however, we

are bound by the limitations of the existing statutory provisions and the transactional form petitioner has chosen.

*Decision will be entered for respondent.*