CLYDE L. FINCHER AND CATHERINE FINCHER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 25727–92.          Filed August 24, 1995.

*J. Edward Mann, Jr.,* for petitioners.
*Joni D. Larson,* for respondent.

PARR, *Judge:* Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows:

*Additions to tax*

| Year | Deficiency | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6653(a)(1) |
|------|-----------|--------------------|--------------------|-----------------|
| 1984 | $79,577 | - - - | - - - | - - - |
| 1985 | 26,123 | - - - | - - - | - - - |
| 1987 | 47,137 | $2,357 | [1] | - - - |
| 1988 | 4,336 | - - - | - - - | $217 |

[1] 50 percent of the interest due on $47,137.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

This case involves the disallowance of two types of deductions: Deductions of an estimated amount of petitioners' deposits in Rio Grande Savings & Loan Association (Rio Grande) when Rio Grande became insolvent, and deductions of amounts paid and interest incurred by Clyde L. Fincher (petitioner) to satisfy his guaranty of a loan that the primary borrower could not repay.

Taxable years 1984 and 1985 are in issue solely because of a net operating loss generated by the deductions in question. After a concession by respondent, the issues for decision are:

(1) Whether, for purposes of section 165(l), petitioner's position as an officer of Rio Grande ended when Rio Grande was placed into conservatorship on May 12, 1987, or when Rio Grande was closed for liquidation on April 28, 1988. We hold that petitioner's position as an officer did not end until Rio Grande was closed for liquidation on April 28, 1988;

(2) whether petitioners are qualified individuals, entitling them to a deduction pursuant to section 165(l) of estimated losses on deposits in Rio Grande. We hold that they are not;

(3) whether petitioners are entitled to a business bad debt deduction pursuant to section 166, or a business expense deduction pursuant to section 162, of deposits in Rio Grande. We hold that the debts did not become worthless within the years in issue, and that section 162 does not apply, and thus

petitioners are not entitled to a deduction under either section;

(4) whether petitioners are entitled to a business bad debt deduction pursuant to section 166 for amounts paid and interest incurred to satisfy a guaranty on a loan. We hold that petitioner did not guarantee the loan in the course of a trade or business, and that petitioners are entitled to treat the amounts paid as a nonbusiness bad debt;

(5) whether petitioners are liable for an addition to tax pursuant to section 6653(a)(1) for tax year 1988. We hold that they are liable for the addition to tax.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, four supplemental stipulations of facts, and the attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioners resided in San Benito, Texas. Petitioners are married and filed joint Federal income tax returns for all the years in issue.

## I. *Deposits in Rio Grande*

Petitioner became chief executive officer of Rio Grande, a Texas savings and loan association, prior to the years in issue. Petitioner was earning about $6,000 per month, or $72,000 per year, in his position as an officer of Rio Grande at the time the financial condition of Rio Grande began to occupy the attention of the Savings and Loan Commissioner of Texas (S&L commissioner).

By order entered March 13, 1987, the S&L commissioner and the officers and directors of Rio Grande, including petitioner, agreed to place Rio Grande under voluntary supervisory control. Less than 2 months later, by order entered May 12, 1987, the S&L commissioner placed Rio Grande into conservatorship. Each order required that "the Association, its directors, officers, employees and shareholders shall act in accordance with the instructions and directions as may be given" by the S&L commissioner through the appointed agent (i.e., the supervisor or the conservator), and that Rio Grande and its officers "shall exercise only the authority" that the appointed agent "expressly grants." The S&L commissioner

directed the conservator to temporarily close Rio Grande on May 12, 1987, to freeze all depositor accounts, and to prohibit deposits, withdrawals, and payments to creditors. As of May 12, 1987, petitioner's keys to the offices of Rio Grande were taken, and petitioner no longer had use of his company car or access to his secretary. No one associated with either the S&L commissioner or Rio Grande ever told petitioner that he was separated from service with Rio Grande, and petitioner never tendered his resignation to anyone associated with Rio Grande. Petitioners received and reported $34,154 of salary income from Rio Grande in 1987, and no salary income from Rio Grande in 1988.

By order dated April 28, 1988, the S&L commissioner closed Rio Grande and appointed an agent to liquidate it. This order was served on petitioner on April 27, 1988. Petitioner did not protest his receipt of the order on the grounds that he was no longer an officer; rather, he signed the order to acknowledge receipt. Petitioner was not an officer of Rio Grande on or after April 28, 1988. Rio Grande was never insured by the Federal Savings and Loan Insurance Corporation.

At the time it was placed into conservatorship, Rio Grande held petitioners' personal deposits in the amount of $448,097 and petitioners' business deposits, relating to a rental business called Robin Hood Apartments, in the amount of $18,389. Petitioners claimed 80 percent of these amounts, or $358,478 and $14,711, respectively, as casualty loss deductions on their 1987 Federal income tax return.[1]

Petitioners could have fully withdrawn the deposits at any time before May 12, 1987, the date the conservatorship began. Petitioners did not withdraw the deposits for two reasons: Petitioner did not think Rio Grande would be closed, and petitioner wanted to continue in his position as an officer when Rio Grande resumed operation. On December 3, 1990, in settlement of a lawsuit for negligence and breach of fiduciary duty brought against them by the liquidating agent and Rio Grande, petitioners assigned to Rio Grande their entire right and interest in the personal deposits.

---

[1] Petitioners decided to deduct 80 percent of each of the deposits after reading an article in the local newspaper that indicated that the Internal Revenue Service (IRS) would consider 80 percent of amounts on deposit at Rio Grande to be a reasonable estimate of the value of the deposits for loss purposes under sec. 165(l).

## II. *Guaranties of Loans*

Independent of his position at Rio Grande, petitioner personally guaranteed a series of loans and renewals of loans made by Harlingen State Bank (Harlingen Bank) to Legend Construction Co., Inc. (Legend), a Texas company owned and operated by Clifford Stratton. Petitioner guaranteed a total of five loans made by Harlingen Bank to Legend, all but the first of which involved the continuation of earlier debt. The first loan, dated June 11, 1986, was for $55,000, with a maturity date of September 9, 1986. The second loan, dated September 9, 1986, was a 1-month extension of the first loan in the amount of $51,375. On September 8, 1986, Clifford Stratton, as directed by petitioner, paid $5,000 to petitioners' son-in-law to compensate petitioner for guaranteeing the first and second loans.

The third loan, dated December 19, 1986, was in the amount of $131,375, with maturity June 19, 1987. The loan document lists the purpose of this loan as "CONSOLIDATION OF LOANS". The fourth loan, dated March 17, 1987, was for $118,473, maturing September 1, 1987. The loan document lists the purpose of this loan as "BUSINESS: RNWL". The fifth loan, dated September 1, 1987, was a loan of $115,473, due March 1, 1988. The loan document lists the purpose of this loan as "BUSINESS: RNWL/CONSOLIDATION LOAN". The loan document also indicates that petitioner, Clifford Stratton, and Clifford's father, Carroll Stratton, guaranteed the loan, but the guaranty document in evidence is signed by petitioner only.[2] Petitioners received no direct consideration for the guaranties of the third, fourth, or fifth loans.

Legend failed to pay off the fifth loan. On September 23, 1988, in order to satisfy his guaranty of the fifth loan, petitioner borrowed $100,000 from Harlingen Bank in renewal of the fifth loan and paid the remaining $10,473 of the guaranty from other funds. On Schedule C of their 1988 Federal income tax return, petitioners deducted the $110,473 payment on the guaranty and the $11,889 interest that was incurred on the $100,000 loan.

---

[2] There may exist other guaranty documents not in the record. The amount of petitioner's guaranty of the fifth loan was reduced to $110,473 on Jan. 1, 1988, such loan apparently having been paid down.

## OPINION

We begin by noting that petitioners have the burden of proving that the determinations made by respondent are incorrect. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111 (1933).

## I. *Claimed Loss Deduction for Deposits*

### A. *Section 165(l)*

Petitioners first seek to deduct the deposits in Rio Grande under section 165(l). Section 165(l) provides, in pertinent part, as follows:

SEC. 165(l). TREATMENT OF CERTAIN LOSSES IN INSOLVENT FINANCIAL INSTITUTIONS.—

(1) IN GENERAL.—If—

(A) as of the close of the taxable year, it can reasonably be estimated that there is a loss on a qualified individual's deposit in a qualified financial institution, and

(B) such loss is on account of the bankruptcy or insolvency of such institution,

then the taxpayer may elect to treat the amount so estimated as a loss described in subsection (c)(3) incurred during the taxable year.

(2) QUALIFIED INDIVIDUAL DEFINED.—For purposes of this subsection, the term "qualified individual" means any individual except an individual—

  \*   \*   \*   \*   \*   \*   \*

(B) who is an officer of the qualified financial institution,

(C) who is a \* \* \* spouse, \* \* \* of an individual described in subparagraph \* \* \* (B), \* \* \*

The only question with respect to this issue is whether petitioners were qualified individuals. Petitioners agree that petitioner Catherine Fincher was a qualified individual only if petitioner was a qualified individual. In analyzing whether petitioner was a qualified individual, we would ordinarily examine his status in 1987, the year in which the deduction was claimed. However, because petitioners pleaded in their amended petition that to the extent the loss is not deductible in 1987, it is deductible in 1988, and the parties have not argued nor stipulated the year in which the amount of the loss became reasonably estimable, we shall analyze both tax years 1987 and 1988.

### 1. *Whether Petitioner Was an Officer for Tax Years 1987 and 1988*

The first issue is whether petitioner remained an officer until Rio Grande was closed for liquidation on April 28, 1988. Petitioners argue that petitioner lost his position as an officer when the S&L commissioner appointed the supervisor or, at the latest, when the S&L commissioner appointed the conservator. Respondent argues that petitioner maintained his position as an officer during the periods of supervisory control and conservatorship, and that during those periods he was required by law to act, in his capacity as an officer, in accordance with the directions of the supervisor or the conservator. We agree with respondent.

The S&L commissioner did nothing to remove petitioner from his position. The orders appointing the supervisor and the conservator indicate that officers of Rio Grande must act pursuant to the instructions of the appointed agent. These orders mirror the language of the relevant Texas statute, which provides that "During the period of conservatorship, an officer * * * shall act according to the instructions of the conservator and shall exercise only the authority that the conservator expressly grants." Tex. Rev. Civ. Stat. Ann. art. 852a, sec. 8.08(d) (West Supp. 1995). Thus, the fact that officers of Rio Grande were ordered to comply with, and to act only under the authority of, the supervisor or the conservator does not mean that the officers were fired from their positions. In fact, the orders and the statute contemplate something else entirely different: that the officers would continue to serve in their capacities as such, discharging their duties for Rio Grande, but doing so under the additional obligation of acting pursuant to the instructions of the appointed agent. The orders do not say anything about removing officers from their positions.

Petitioners' sole claim is that the actions of the S&L commissioner caused petitioner's employment with Rio Grande to end. They do not claim, and have not presented any evidence, that petitioner actually resigned or actually was fired. Although petitioner received only $34,154 in salary income from Rio Grande during 1987 and no salary income from Rio Grande during 1988, this does not, by itself, prove that petitioner's position as an officer ended in 1987. While

petitioner testified that he "considered * * * [himself] separated and fired" when the conservatorship began, this is weakened by other testimony that he thought he would "continue in * * * [his] capacity as an officer" even after the S&L commissioner [took] over the operation of Rio Grande. Moreover, while the S&L commissioner's order sharply restricted the authority of the shareholders and officers, it did not terminate or replace them. Petitioner's argument is further weakened by the fact that petitioner was served notice of the order closing Rio Grande for liquidation in 1988, and he signed the order without protesting that he should not have been served because he was no longer an officer. Accordingly, we find that petitioner was an officer for purposes of section 165(l) until April 28, 1988. We therefore hold that he was not a qualified individual for purposes of section 165(l) for 1987.

### 2. Whether Petitioners Were "qualified individuals" for Tax Year 1988

Notwithstanding our finding that petitioner was an officer until April 28, 1988, petitioners assert that petitioner was a "qualified individual" because petitioner was not an officer for the *entire* taxable year. Petitioners argue that a "qualified individual" is defined as any individual except an individual "who *is* an officer". Sec. 165(l)(2)(B) (emphasis added). They read this phrase from the definition of qualified individual in conjunction with the first phrase of section 165(l)(1)(A) to argue that a qualified individual is any individual except an individual who is an officer as of the close of the taxable year. Petitioner argues that he was not an officer "as of the close of the taxable year" 1988. Petitioners contend that this gives petitioner the status of "qualified individual", authorizing the deductions for 1988. Respondent argues that the phrase "as of the close of the taxable year" modifies only the phrase "If— * * * it can reasonably be estimated" in section 165(l)(1), so that section 165(l) applies to any person who was an officer at any time during the year, if the estimation can be made as of the close of the taxable year. We agree with respondent.

Statutory construction begins with the language of the relevant statute. *Consumer Prod. Safety Commn. v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). We may use legislative

history to clarify an ambiguous statute. *City of New York v. Commissioner,* 103 T.C. 481, 489 (1994). Moreover, even where the statutory language appears clear, we may seek out any reliable evidence as to legislative purpose. *Id.*

Petitioners' reading of the statute is clearly at odds with its language. Essentially, they attempt to attach the phrase "as of the close of the taxable year" to the definition of "qualified individual", even though the phrase appears in section 165(l)(1) and the definition in section 165(l)(2). If Congress wanted the phrase "as of the close of the taxable year" to apply to the phrase "who is an officer", both phrases would appear together in the definition of "qualified individual" in section 165(l)(2)(B). It is clear that the phrase "as of the close of the taxable year" modifies "If— * * * it can reasonably be estimated". This can be seen from the proximity of the phrases in question, in particular from the fact that the phrase "as of the close of the taxable year" is parenthetical to the phrase "If— * * * it can reasonably be estimated". The legislative history provides reliable evidence to bolster this reading:

> The committee bill allows qualified individuals to elect to deduct losses on deposits in qualified financial institutions as casualty losses in the year in which the amount of such loss can be reasonably estimated. * * *
>
> A qualified individual is any individual other than * * *, an officer of such institution, and certain relatives and related persons to such * * * officers. * * *
>
> [H. Rept. 99–426, at 596–597 (1985), 1986–3 C.B. (Vol. 2) 1, 596–597.]

The House report makes no reference to the close of the taxable year, stating instead that the deduction can be taken in the year in which the amount of such loss can be reasonably estimated. *Id.* This is precisely respondent's interpretation of section 165(l), and we agree with it.

This interpretation is further borne out by the purpose behind the phrase "as of the close of the taxable year" in section 165(l). Pursuant to section 165(l), as long as the estimate of the amount of the loss can reasonably be made as of the close of the taxable year, the taxpayer can take the deduction in the taxable year. Without section 165(l), section 166 would apply, and under section 166, the taxpayer must take the deduction in the year in which the debt becomes worthless. Sec. 166(a)(1) and (2), (d)(1); see discussion *infra*

pp. 137–138. The purpose of the phrase in question is to give the taxpayer the deduction earlier than it would otherwise be allowed. See H. Rept. 99–426, *supra* at 596, 1986–3 C.B. (Vol. 2) at 596.

However, the fact that the phrase "as of the close of the taxable year" does not apply to the phrase "who is an officer" does not end the inquiry. Section 165(l)(2)(B), by its terms, does not provide for a particular period of time during the year when an individual must avoid being an officer in order to be a qualified individual.

In respondent's view, the purpose behind section 165(l)(2) is to prevent the officers, the persons most responsible for causing the insolvency or bankruptcy of the savings and loan, from benefiting from the provisions of section 165(l)(1). In particular, respondent argues that an individual who serves as an officer for part of the taxable year should not be able to elect the benefit of section 165(l)(1) by resigning just before "the close of the taxable year". The way to prevent this benefit, according to respondent, is to apply section 165(l)(2)(B) to preclude an individual who is an officer at any time during the taxable year from being a qualified individual.

That Congress wanted to exclude officers and their spouses from the benefits of section 165(l) is beyond dispute. This is apparent from the definition of qualified individual in section 165(l)(2). The only question is how broad Congress intended the exclusion to be. We think the exclusion is broad enough to keep petitioners outside the scope of the benefit created by section 165(l).

Allowing petitioners the deduction under section 165(l) would sap the limitation in section 165(l)(2) of any strength. If the term "officer" in section 165(l)(2)(B) refers only to an individual who is an officer as of the close of the taxable year, the status of "qualified individual" can be manipulated to give the benefit of section 165(l) to any officer who can avoid being an officer "as of the close of the taxable year". In order to prevent such manipulation of the statute, we read section 165(l)(2) to exclude from the definition of qualified individual any individual who is an officer at some point during the taxable year. Petitioners offer no reason, and we see no basis, for believing that Congress intended to use a period of time shorter than the taxable year. We have found that

petitioner was an officer during 1988. Accordingly, petitioners are precluded from taking a deduction under section 165(l) in 1988.

Since petitioners' deduction does not qualify under section 165(l) for either 1987 or 1988, we sustain respondent's determination.

### B. *Section 166*

The next issue is whether petitioners may deduct the amounts on deposit in Rio Grande as bad debts under section 166. Failure to claim a loss under section 165(l) does not prevent application of section 166. H. Rept. 99–426, *supra* at 597, 1986–3 C.B. (Vol. 2) at 597. Pursuant to section 166, business debts can be deducted, in whole or in part, in the year within which they become wholly or partially worthless. Sec. 166(a)(1) and (2). Nonbusiness debts can only be deducted as short-term capital losses in the year within which they become wholly worthless. Sec. 166(d)(1)(A) and (B); sec. 1.166–5(a)(2), Income Tax Regs. A nonbusiness debt is a debt other than "a debt created or acquired * * * in connection with a trade or business of the taxpayer" or "a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." Sec. 166(d)(2)(A) and (B). Petitioners argue that the debts were business bad debts. Respondent argues that the debts are not business bad debts and did not become worthless within the years in issue. We agree with respondent.

### 1. *Nature of the Deposits*

We first decide the nature of the debts in question. The business deposit of Robin Hood Apartments was a business debt under section 166(d)(2)(A) because it was created in connection with the trade or business of Robin Hood Apartments. The personal deposits of petitioners were not created in connection with a trade or business, so we look to section 166(d)(2)(B).

In order for a debt to be a business debt under section 166(d)(2)(B), the loss from the worthlessness of the debt must bear a "proximate" relation to the taxpayer's trade or business. Sec. 1.166–5(b)(2), Income Tax Regs. "[I]n determining whether a bad debt has a 'proximate' relation to the taxpayer's trade or business, * * * the proper measure is that

of dominant motivation". *United States v. Generes,* 405 U.S. 93, 103 (1972).

Petitioners argue that petitioner's dominant motive for deciding not to withdraw the deposits before Rio Grande was placed into conservatorship was to preserve petitioner's position at Rio Grande. However, petitioners presented no evidence that withdrawing the deposits would have had any effect on petitioner's employment. The entire evidence relating to petitioner's reason for not withdrawing the deposits consists of the following testimony:

Q [by Mr. Mann]: Okay. Why didn't you withdraw the funds when you knew that you could have, prior to the conservator being appointed?

A [by petitioner]: Well, I didn't think it was—would be advisable for two or three reasons. One is, I had a connection there that I wanted to maintain. I actually didn't—it didn't occur to me that they might actually close Rio Grande. It was my impression that they might take over the operation of it and continue its operation, and I would continue in my capacity as an officer.

And because of that continuing and wanting to continue in that capacity, I didn't think it was wise to withdraw this money.

Q: Okay. Was one of the reasons you didn't withdraw your funds, you mentioned to the Court, that you wanted to protect your paycheck at the savings and loan?

A: Well, yes. That is correct.

As the testimony indicates, petitioner, in answering a leading question from his attorney, considered the protection of his paycheck as only *one* of the reasons for maintaining the deposits. We do not believe that the dominant motivation for petitioner's putting over $448,000 of after-tax dollars at risk was to preserve a salary of $72,000. See *United States v. Generes, supra* at 106–107. Petitioners kept the deposits in Rio Grande because they did not think Rio Grande would be closed. Thus, we hold that any loss that did result from the personal deposits in Rio Grande was not incurred in petitioner's trade or business, and therefore can only give rise to a nonbusiness debt.

### 2. *Evidence of Worthlessness*

The next issue is whether, and to what extent, the debts became worthless during the years in issue. Worthlessness is a question of fact that must be based on all the circumstances. *Dallmeyer v. Commissioner,* 14 T.C. 1282, 1291 (1950). The year of worthlessness is the year in which identi-

fiable events provide the taxpayer with reasonable grounds for abandoning hope of recovery. *Crown v. Commissioner,* 77 T.C. 582, 598 (1981). Petitioners must show sufficient objective facts from which worthlessness could be concluded; mere belief of worthlessness is not sufficient. *Fox v. Commissioner,* 50 T.C. 813, 822–823 (1968), affd. per curiam 25 AFTR 2d 70–891, 70–1 USTC par. 9373 (9th Cir. 1970).

Respondent argues that the deposits were not worthless in 1988 because they had value on December 3, 1990, the date petitioners assigned their right and interest in the deposits to Rio Grande in settlement of the lawsuit brought by Rio Grande and the liquidating agent. This factor, by itself, does not convince us that the deposits had value in 1988. Subsequent recoveries do not preclude otherwise valid deductions. *Estate of Mann v. United States,* 731 F.2d 267, 277 (5th Cir. 1984), and cases cited therein.

The only evidence petitioners presented as to the worthlessness of the debts in this case is the fact that Rio Grande was closed for liquidation in 1988. Petitioners presented no evidence of the assets of Rio Grande at the time it was closed for liquidation, or of the likelihood that depositors would recover some part of their deposits in 1988. The value of the deposits is a question to be determined from the amount of the assets of the debtor, the number of creditors, and the expenses of administration. *Patten & Davies Lumber Co. v. Commissioner,* 45 F.2d 556, 558 (9th Cir. 1930) (referring to bankruptcy proceeding). In addition, petitioners presented no evidence of any action taken to recover the deposits, and no explanation for failing to take action. Rio Grande's nonpayment of the debt does not prove the worthlessness of the deposits, and petitioners' failure to take reasonable steps to collect the debt is justified only if those steps would be futile. *Perry v. Commissioner,* 22 T.C. 968, 974 (1954). Petitioners have not demonstrated that the $448,097 personal deposits were wholly worthless in 1988, nor have they shown that any part of the $18,389 business deposit was worthless in 1988. Accordingly, petitioners fail to qualify for the deduction under section 166.

## C. *Section 162*

Petitioners also seek to deduct the debts as ordinary and necessary business expenses under section 162. However,

section 162 does not apply to debts. *Horne v. Commissioner,* 59 T.C. 319, 336 (1972), affd. 523 F.2d 1363 (9th Cir. 1975). In this case, the parties do not dispute that the deposits were debts owed by Rio Grande to petitioners. Therefore, section 162 does not apply, and petitioners may not deduct the deposits as ordinary and necessary business expenses.

## II. *Claimed Bad Debt Deductions of Loan Guaranty*

Petitioners argue that amounts paid on a guaranty of a loan, and interest incurred to finance the amounts paid, may be deducted as a business bad debt. Respondent argues that petitioner had a right of subrogation for the guaranty, and that in any event the amounts paid on the guaranty constitute a nonbusiness bad debt.

### A. *Year of Worthlessness*

Respondent begins by arguing that because petitioner had a right of subrogation on the guaranty, petitioners have not proven that the debt became worthless during 1988. Cf. sec. 1.166–9(e)(2), Income Tax Regs. (referring to a right of subrogation against the *issuer*). We reject respondent's argument for two reasons. First, in the notice of deficiency, respondent disallowed the business bad debt deduction for 1988, but allowed a nonbusiness bad debt deduction. Respondent's determination was based on an implied assumption that the debt was wholly worthless within the taxable year 1988, and respondent first raised the issue that the debt was not worthless in her trial memorandum. See Rule 36(c); *Diamond v. Commissioner,* 92 T.C. 423, 446 (1989), affd. 930 F.2d 372 (4th Cir. 1991). Second, there is only one piece of evidence that any person other than petitioner was obligated as a guarantor on the fifth loan: a typed statement on the loan document indicating that Clifford Stratton and Carroll Stratton guaranteed the loan. Neither Clifford Stratton nor Carroll Stratton was the *issuer* of the note; the note was issued by Legend Construction Co. Moreover, neither of the Strattons signed either the loan document as guarantor or the actual guaranty document. We find that only petitioner guaranteed the fifth loan, and consequently that the amounts paid on the guaranty constitute a bad debt wholly worthless within 1988.

## B. *Nature of the Guaranty*

Petitioners argue that petitioner was in the business of guaranteeing loans, whereas respondent argues that the loan guaranties were not made in the course of a trade or business. Petitioner guaranteed five loans made by Harlingen Bank to Legend. However, he received consideration only for the guaranties of the first two loans, not for the guaranties of the third, fourth, and fifth loans. Petitioners have failed to prove that the guaranty of the fifth loan was made in the course of a trade or business, and we sustain respondent's determination that the payments made in satisfaction of the guaranty of the fifth loan constituted a nonbusiness bad debt.[3]

## C. *Interest Incurred To Pay the Guaranty*

In the notice of deficiency, respondent disallowed the deduction of $11,889 as business interest, but allowed a deduction of a portion of the $11,889 as "personal interest". Petitioners contend that the payments of both principal and interest fall within the ambit of section 166.

The regulations provide that "a payment of principal *or interest* made * * * in discharge of part or all of the taxpayer's obligation as a guarantor * * * is treated as a worthless nonbusiness debt", and that section 163 does not apply to such payment. Sec. 1.166–9(b), Income Tax Regs. (emphasis added).

Accordingly, we hold that the $11,889 interest incurred on the guaranty of the fifth loan is deductible as a nonbusiness bad debt.

## III. *Addition to Tax Under Sec. 6653(a)(1)*

For 1988, section 6653(a)(1) provides that if any part of the underpayment of tax is due to negligence or disregard of rules or regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment. Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *Neely v. Commissioner,* 85 T.C. 934, 947 (1985) (citing

---

[3] Respondent agrees that if, as we have found, the debt was worthless during 1988, then petitioners are entitled to treat the amounts paid on the guaranty as a nonbusiness bad debt. Respondent did not raise any issue concerning the requirements of sec. 1.166–9(e)(1), Income Tax Regs.; we thus assume they were met.

*Marcello v. Commissioner,* 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964)).

Petitioners have not presented any objective facts, nor any argument beyond a simple assertion, that they were not negligent in failing to report income in 1988.

On this record, we sustain respondent's determination that petitioners are liable for the addition to tax under section 6653(a)(1) in 1988.

We have considered all other arguments made by petitioners, and, to the extent not discussed above, we find them without merit.

To reflect the foregoing and the concession by respondent,

*Decision will be entered under Rule 155.*