**CITY OF NEW YORK, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 94–1739.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 30, 1995.
Decided Nov. 28, 1995.

Robert J. Firestone, of Counsel, Corporation Counsel's Office of the City of New York, argued the cause for appellant, with whom Edward F. Hart was on the brief.

Kevin M. Brown, Attorney, United States Department of Justice, argued the cause for appellee, with whom Loretta C. Argrett, Assistant Attorney General, Gary R. Allen and Bruce R. Ellisen, Attorneys, were on the brief.

Before WALD, SILBERMAN and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The City of New York appeals from a decision of the Tax Court rejecting its request for a declaratory judgment that the

interest paid on general obligation bonds that the city seeks to issue will be exempt from taxation. We affirm.

## I.

The interest paid on bonds issued by municipalities is, with a few exceptions, excluded from taxable income. 26 U.S.C. § 103(a) (1988). The exception relevant here restricts the use of bond proceeds to finance "private activity." 26 U.S.C. § 103(b)(1). Under § 141(c), a bond is a non-tax-exempt "private activity bond" if:

> the amount of the proceeds of the issue which are to be *used* (directly or indirectly) to *make* or *finance* loans ... to persons other than governmental units exceeds the lesser of—
>
> (A) 5 percent of such proceeds, or
>
> (B) $5,000,000.

26 U.S.C. § 141(c) (1988) (emphasis added). New York, a frequent issuer of both taxable and tax-exempt bonds, sought a ruling from the IRS that a particular bond scheme would not exceed § 141(c)'s limitations on private loans. Under the plan set forth in the ruling request, the city proposed to issue $100 million in general obligation bonds, and to apply $15 million of the bond proceeds to a variety of programs designed to improve its dilapidated housing stock. The $15 million would be loaned to private parties to purchase, renovate, and/or maintain buildings in New York which would then be rented or sold to low- to moderate-income persons. The money would be loaned either without interest or at interest rates lower than the interest rate on the bonds. In anticipation of receiving a favorable ruling from the Service, the city funded these programs with short-term, non-exempt bonds, which it planned to refund using the proceeds of tax-exempt bonds.

New York's ruling request contended that the amount of bond proceeds that the city would use to make loans under the housing programs was not $15 million, but the much lower net present value of the loan repayments that the city would receive from program participants. The IRS rejected this argument and ruled that the amount of proceeds used by New York for the loans would exceed $5 million and that the proposed bond issue therefore constituted a "private activity bond." Priv.Ltr.Rul. 31–0453–92 (Sept. 22, 1992). New York sought a declaratory judgment from the Tax Court pursuant to 26 U.S.C. § 7478(a)(1) (1989). The Tax Court, largely for the same reasons as the Service, denied the city a declaratory judgment. *City of New York v. Commissioner*, 103 T.C. 481, 499–500, 1994 WL 551412 (1994). The city filed for review in this court pursuant to § 7482(b)(3) (1989).

## II.

■ We asked the parties whether New York has sustained sufficient injury-in-fact to establish Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Since this appeal is from the denial of a declaratory judgment, we must decide "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). The city has adopted the resolutions necessary under the laws of both the State and city of New York to issue general obligation bonds of the sort at issue here and, in the event of a favorable ruling, will almost certainly issue the bonds (if not at the now-outmoded interest rates). Indeed, such issues are, according to New York's Corporation Counsel, routine. The programs under which the subsidized loans are to be made have been established and are operating. New York has thus far funded these programs using non-exempt, short-term bonds with the intention of funding both those bonds and the programs with the proceeds of general obligation bonds. Since it is certain to issue bonds of this sort in the future; since it has created the housing programs in anticipation of funding them with tax-exempt bond proceeds; since it has issued non-exempt (and thus more expensive) bonds to fund these programs in the expectation that this expense would be allayed with later, tax-exempt bond issues; and since the city can-

not, as a practical matter, sell any of its general obligation bonds at a tax-exempt interest rate without a favorable ruling, we believe New York is injured-in-fact by the Service's and Tax Court's rulings.

. . . .

New York contends that, on the facts presented to the Service and the Tax Court, it would not "use" all of the $15 million to make a loan under the subsidized housing programs. The statute provides that the relevant measure for purposes of the ceiling is "the amount of the proceeds of the issue which are to be *used* (directly or indirectly) to make or finance loans." The city argues that the $15 million it proposes to loan actually consists of two, discrete components. The loan component—the amount subject to § 141(c)'s limits—should be measured only by the net present value of the amounts that New York will receive *back* from program participants, approximately $4.8 million. The city arrives at the loan component by estimating the interest rate it expects to pay on the bonds (8.5%) and the average rate it expects to charge on the loans (2%), and then calculating the present value of the repayments the borrowers must make on the loans, discounted at the 8.5% projected market rate yield on the bonds. Subtracting the loan component from $15 million yields an amount—the second component—that is a subsidy to the program participants. In other words, New York must make up the difference between the amount that the city will repay to bond holders ($15 million at 8.5%) and the amount that it will receive back from participants in the subsidized loan programs ($15 million at less than 8.5%). Therefore, the city "uses" only the first component of the proceeds to make or finance loans and

that amount does not exceed the 5% or $5 million ceiling of § 141(c).

Appellant emphasizes that § 141(c) (and its neighbor, § 141(b)) was enacted to limit conduit financing—borrowing by municipalities on behalf of private parties at a tax-exempt interest rate.[1] To the extent that it is subsidizing the loans, the city is not engaged in conduit financing and thus the subsidy ought not to count toward the ceiling amounts. New York points out that the IRS itself, with respect to § 141(b)(2)(B), has embraced present value computations in order to distill conduit financing out of subsidized transactions. *See* I.R.S. Notice 87–69, 1987–2 C.B. 378. The approach followed with respect to § 141(b)(2)(B) should be adhered to with respect to § 141(c).

The Service responds that the language of § 141(c) is clear: the amount of proceeds "used to make or finance loans" is the amount of proceeds that New York provides to program participants and that the program participants must repay—$15 million. New York's argument that the below-market interest rate transforms a portion of the loan into a subsidy, says the IRS, is foreclosed by the plain language of the statute and the common understanding of the word "loan." The Service acknowledges that the purpose of § 141(c) is, like that of § 141(b), to restrict conduit financing. And the Service concedes that it has interpreted § 141(b)(2)(B) as requiring present value computations. But this interpretation is necessitated by the requirement in § 141(b)(2)(B) of comparing two streams of payments ("payment of the principal of, or interest on, [the bonds]" on the one hand, "payments ... in respect of property, or borrowed money" on the other) that may have entirely different discount rates and

1. Section 141(a) provides that a bond is a nonexempt "private activity bond" if it meets the "private business test" of § 141(b)(1) *and* the "private security or payment test" of § 141(b)(2), or if it meets the "private loan financing test" of § 141(c). Section 141(b)(2) states that:
an issue meets the test of this paragraph if the payment of the principal of, or the interest on, more than 10 percent of the proceeds of such issue is (under the terms of such issue or any underlying arrangement) directly or indirectly—

(A) secured by any interest in—
(i) property used or to be used for a private business use, or
(ii) payments in respect of such property, or
(B) to be derived from payments (whether or not to the issuer) in respect of property, or borrowed money, used or to be used for a private business use.
26 U.S.C. § 141(b)(2) (1988).

may extend over entirely different time periods, making meaningful comparison impossible without reducing the streams to a common measure. Section 141(c), on the other hand, calls for a simple comparison of two numbers: the amount of proceeds loaned (here, $15 million) and the statutory ceiling ($5 million).

■ Whatever its basis in economics, New York's position simply does not comport with the plain language of the statute. Section 141(c) sets a ceiling on the amount of bond proceeds "used ... to make or finance loans" at $5 million (or 5% of the bond proceeds). It is undisputed that the amount of money received from New York by program participants will be $15 million, taken out of the $100 million in bond proceeds. It is further undisputed that the amount of money that program participants must repay is $15 million. The notion that the amount of money "used to make" a loan is determined not by the amount given by the lender and received and to be repaid by the borrower but rather by the net present value of the payments from the borrower to the lender is novel, to say the least, and hardly follows from Congress' unambiguous language.[2] New York's theory, moreover, leads to complexities and uncertainties that the use of a simple, mechanical test evidently sought to avoid. In the face of Congress' silence on the question of whether a lower interest rate on a loan of bond proceeds by the municipality serves to reduce the "amount of proceeds used," New York's interpretation is an impermissible stretch.

Were we not convinced that New York is "using" $15 million of bond proceeds to "make" $15 million worth of loans to housing program participants, we would still hold that New York's proposal exceeds § 141(c)'s ceiling amounts. New York's contention that it is only "using" bond proceeds to "make" loans to the extent that the money will be repaid and that the remainder of the $15 million constitutes a subsidy, alternatively runs afoul of the statutory language concerning the use of proceeds to "finance loans." It seems clear that whatever portion of the $15 million is not being used to *make* a loan is being used to *finance* the portion that is a loan.

Nor are we persuaded by New York's recourse to the legislative history, which stands for nothing more than that Congress sought to limit conduit financing. That this legislative purpose is somehow frustrated by the use of a straightforward test to determine whether an issue is tax-exempt does not follow. Further, New York's point that § 141(b)(2)(B), using net present value computations, counts bond proceeds only to the extent that the issuing municipality acts strictly as a conduit—and, therefore arguably does a better job of capturing only conduit financing than does § 141(c) as interpreted by the Service and the Tax Court—does not compel the conclusion that § 141(c) must also use net present value computations. We are particularly loathe, in the tax area, to ignore plain language when doing so amounts to erring on the side of exclusion of interest from taxable income. *See, e.g., United States v. Wells Fargo Bank*, 485 U.S. 351, 354, 108 S.Ct. 1179, 1181, 99 L.Ed.2d 368 (1988) ("exemptions from taxation are not to be implied; they must be unambiguously proved"); *Commissioner v. Jacobson*, 336 U.S. 28, 49, 69 S.Ct. 358, 369, 93 L.Ed. 477 (1949).[3]

. . . .

**2.** New York quibbles over whether the commonly understood meaning of the term "loan" is money to be repaid or money to be repaid *at interest*. Compare BLACK'S LAW DICTIONARY 844 (5th ed. 1979) ("[d]elivery by one party to and receipt by another party of sum of money upon agreement, express or implied, to repay it with or without interest"), *with* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1326 (1971) ("money lent at interest"). New York argues that "loan" means "money lent at interest" and—as we understand it—implies that "at interest" must mean "at a market rate of interest" such that proceeds used to make a loan at a below-market (or zero) interest rate do not count toward the statutory ceiling. Whether Congress intended the term "loan" in § 141(c) to require repayment at interest (and we see no reason to think it did), a market-interest-rate requirement is certainly not contemplated.

**3.** New York suggests that the Tax Court's interpretation will lead municipalities to arrange bond transactions that should be limited to $5 million in private activity funding in order to enjoy the larger ceiling amount provided in § 141(b) (10%). We are not at all certain as to how—or whether—this can be done. But, we are satisfied that New York's proposed bond issue is subject to and exceeds the limits in § 141(c).

New York's interpretation of § 141(c) does not comport with that section's plain language. We therefore affirm the Tax Court's denial of declaratory judgment.