120 T.C. No. 12


UNITED STATES TAX COURT



CITY OF SANTA ROSA, CALIFORNIA, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7310-00B.                    Filed May 13, 2003.


        P petitions this Court pursuant to sec. 7478,
I.R.C., seeking a declaration that interest on certain
bonds will be exempt from taxation under sec. 103(a),
I.R.C.  P proposes to issue bonds of $140 million to
finance the construction of a pipeline.  The pipeline
will dispose of wastewater generated in P's subregional
sewage and water reclamation system.  P has entered
into an agreement obligating P to deliver, and a
utility company to accept, an average of 11 million
gallons of wastewater per day.  The utility company
will use the wastewater to activate geysers and produce
steam for the generation of electricity.  P will
receive no payments from the utility company for the
wastewater.  P will enter into agreements with
irrigators along the pipeline obligating P to supply
wastewater for consideration not to exceed 5 percent of
the debt service on the bonds.  At least 95 percent of
the debt service on the bonds will be paid by sewer
demand fees imposed on users of P's sewage system.  The
sewage ratepayers use the pipeline as members of the
general public.  The pipeline is an integral part of

P's sewage system, and it was constructed for the purpose of disposing of the wastewater generated in P's sewage treatment process.

R determined that the bonds will be private activity bonds under sec. 141(b)(1) and (2), I.R.C., and that interest on the bonds will not be exempt from taxation under sec. 103(a), I.R.C.

Held: Private business use does not exceed 10 percent of the proceeds of the bond issue. The private business use test of sec. 141(b)(1), I.R.C., is not met. The proposed bonds are not private activity bonds, and interest on those bonds will be excludable under sec. 103(a), I.R.C.


David L. Miller and David A. Walton, for petitioner.

Gary W. Bornholdt and Timothy L. Jones, for respondent.


OPINION


RUWE, Judge: This is an action for declaratory judgment pursuant to section 7478.[1] Petitioner requested a ruling from respondent that interest on bonds it proposes to issue will be excludable from gross income under section 103(a), and that the proposed bonds will not be private activity bonds within the meaning of section 141(a). Respondent determined that the proposed bonds will constitute private activity bonds, and any interest on the proposed bonds will not be excludable from gross income under section 103(a). The issue for decision is whether

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code currently in effect, and all Rule references are to the Tax Court Rules of Practice and Procedure.

interest on the proposed bonds will be excludable from the gross income of prospective bondholders under section 103(a).

## Background

This case was submitted fully stipulated under Rule 122. The stipulation of facts, the stipulation as to administrative record, and the attached exhibits are incorporated herein by this reference.

Petitioner is a political subdivision of the State of California and has taxing powers, police powers, and powers of eminent domain under the constitution and laws of that State. Petitioner owns and operates a subregional sewage and water reclamation system, which includes facilities for collection and treatment of sewage and other effluent, tertiary treatment of the wastewater produced therefrom, a reservoir for storing wastewater, pipelines, and other facilities for the transportation of wastewater to discharge points.[2] This system serves approximately 250,000 people in central Sonoma County, California, including the cities of Santa Rosa, Rohnert Park, Cotati, and Sebastopol, as well as a portion of the unincorporated area of Sonoma County. As of July 31, 1996, the system had a capacity for 18 million gallons of wastewater per day, which was disposed of by means of urban irrigation, created

---

[2]Wastewater or effluent generated by petitioner's sewage treatment process receives tertiary treatment under California Department of Health Services standards before any discharge.

wetlands in the Santa Rosa Plain, agricultural irrigation, and discharge to the Russian River via the Laguna de Santa Rosa.[3]

In recent years, population growth and other factors prompted petitioner to find other alternatives for disposal of wastewater. On April 18, 1995, the Santa Rosa City Council agreed to consider five alternatives to deal with the increasing amounts of wastewater:

Alternative 1:  No Action (No Project).

Alternative 2:  South County Reclamation; agricultural irrigation and associated reclaimed water storage in areas south of Santa Rosa.

Alternative 3:  West County Reclamation; agricultural irrigation and associated reclaimed water storage in areas west of Santa Rosa.

Alternative 4:  Geysers Recharge; injection of reclaimed water for recharge of the Geysers steamfield located in northeastern Sonoma County.

Alternative 5:  Discharge; release of reclaimed water to the Russian River or Laguna de Santa Rosa at a design discharge rate of up to 20 percent of river flow.

After those alternatives were discussed and considered, petitioner chose a modified form of alternative 4, the "Geysers

---

[3]According to a document entitled "Comparison of Alternatives and Statement of Overriding Considerations":

The current Basin Plan limits Russian River discharges to 1% of the flow at the point of discharge, and the City of Santa Rosa is operating under an interim permit granting discharge at up to 5% discharge of Russian River flow with permission from the Executive Officer of the Regional Water Quality Control Board.

Alternative", which provides for the disposal of wastewater through a pipeline to various electric utility, industrial, agricultural, commercial, residential, and other users. Under this proposal, a pipeline, four pumping stations, tanks, connection equipment, control systems, power systems, and a storage tank will be constructed. The pipeline will be constructed in two sections. The first section will run from the sewage treatment plant and reservoir to the base of a mountain, a distance of 29 miles. This section will have a capacity of 40 million gallons of wastewater per day. The second section will run a distance of 12 miles from the base to the top of the mountain, where a thermally active geyser steamfield is located. This section will have a capacity of 12.1 million gallons of wastewater per day.

On April 14, 1998, petitioner entered into an agreement with Union Oil Co. of California, NEC Acquisition Co., and Thermal Power Co. (collectively Company).[4] Petitioner agreed to deliver to Company approximately 11 million gallons of wastewater per day over the 30-year term of the contract.[5] In exchange, Company agreed to accept approximately 11 million gallons of wastewater

_____

[4]Company is a "nongovernmental person" under sec. 141 and the regulations.

[5]The agreement speaks in terms of an "Annual Amount" and obligates petitioner to deliver, and Company to accept, 4,015 million gallons of wastewater each year (an average of 11 million gallons per day).

per day and also agreed to provide the electricity necessary to operate three of petitioner's pumping stations. The wastewater must meet the California Department of Health Services standards for tertiary treatment, and Company will have the right to access petitioner's facilities and records to test the water or verify its quality. Company will pay no fees, directly or indirectly, to petitioner for use of the wastewater.

Company will use the wastewater to generate electricity for sale to customers. To do so, Company has to take the wastewater and inject it into the ground where the wastewater will become heated and produce steam. Petitioner will not receive any revenues from or other interest in Company's electricity operation. Petitioner will provide all labor, materials, and capital for the construction, operation, and maintenance of the pipeline and related facilities from the existing sewage system to a "point of delivery connection".[6] Company will provide all labor, materials, and capital for the construction, operation, and maintenance of additional pipeline and related facilities from the point of delivery, as well as the electric supply facilities for three of the four pumping stations along the

_____

[6]Petitioner is obligated to supply the wastewater at a "point-of-delivery connection". The agreement defines the term "point of delivery" as "the point at which * * * [petitioner] delivers water to * * * [Company] located at the discharge flange of the storage distribution tanks".

pipeline.[7] Company will own or lease the geyser steamfield, the facilities for injecting the wastewater into the ground, the facilities for generating electricity, and the electric supply facilities for the pumping stations.

According to the agreement, a failure by either party to receive or deliver the obligated amounts of wastewater will require mediation.  If mediation fails, the nondefaulting party can either declare the defaulting party in breach of the contract or seek specific performance.[8]  If Company should breach the contract within the first 20 years of its term, petitioner can terminate the contract and collect liquidated damages of $3 million for each year remaining on the contract up to a maximum of 10 years.  During the last 10 years of its term, Company can terminate the contract at any time provided it gives notice to petitioner and pays $3 million for each year remaining in the contract's term.  Petitioner does not expect that the contract with Company will be breached by either party or that Company will pay petitioner any liquidated damages.

---

[7]The agreement states:  "[Company] shall provide the electricity, at no cost to * * * [petitioner], to operate pumping stations two, three and four, or any substitute stations."  The three pumping stations will pump the wastewater uphill to the point of delivery.

[8]A nondefaulting party can request a temporary restraining order and a preliminary injunction to prevent a default under the agreement or to compel performance.

Of the 40 million gallons of wastewater per day that could conceivably pass through the first section of pipeline, approximately 29 million gallons will be available for various users (irrigators) along its route.[9]  Those users are expected to consist of vineyards and other growers, ranchers, homeowners in large rural settings, parks, and others.  Petitioner intends to enter into agreements with the irrigators for periods of 10 to 20 years, which will guarantee a certain amount of wastewater at a negotiated cost to the irrigators.[10]  Petitioner's ruling request represents that "Aggregate amounts received from the Irrigation Contracts will not exceed 5 percent of debt service on the Bonds."

General rates and charges (sewer demand fees) are presently imposed on users of petitioner's sewage system.  The various fees are set by an ordinance which provides a generally applicable

_____

[9]This assumes 11 million gallons per day of wastewater will be transported to the geyser steamfield for use by Company. However, an exhibit entitled "Table of Delivery Rates" shows that estimated flows of wastewater per day to the geyser steamfield will range from 9.0 million gallons in April and May to 12.1 million gallons in November, December, and January.

[10]According to petitioner, irrigators must take water from the pipeline in the winter and spring when greater amounts of wastewater are available and fill ponds and reservoirs for future use.  It is unlikely that those users will have ponds or reservoirs currently in place, and each user could incur significant capital expenditures for construction of ponds and reservoirs, as well as the related pumping and connection equipment.  Those users will want assurances that the pipeline will be built and that they will be guaranteed a certain amount of the wastewater.

published rate schedule. There are no specially negotiated rate arrangements for the disposal of sewage among users of the sewage system. The sewage disposal functions of petitioner's sewage system are available for general public use. The sewer demand fees will secure and will be used to pay the debt service on the bonds. Debt service on the bonds will require petitioner to increase the sewer demand fees. Petitioner expects, as of the issue date, that the sewer demand fees will pay more than 95 percent of the debt service on the bonds.

On June 2, 1998, petitioner adopted a resolution authorizing the issuance of bonds (Series 1998A bonds). On September 17, 1998, petitioner issued taxable bonds of $31 million, the proceeds of which, according to petitioner, were used to finance the costs of the first phase of construction and acquisition in the Geysers Alternative. Petitioner proposes to issue additional bonds of $140 million to finance anticipated costs of completing the project and expects to use $31 million of the issue to refund the taxable bonds on a tax-exempt basis.

## Discussion

### A. Introduction

Gross income includes all income from whatever source derived including interest. Sec. 61(a)(4). Under section 103(a), gross income does not include interest on any State or local bond. However, section 103(a) does not apply to "Any

private activity bond which is not a qualified bond (within the meaning of section 141)." Sec. 103(b)(1). We must determine in the instant case whether the bonds that petitioner proposes to issue are private activity bonds.[11] The parties stipulated that the bonds will not be qualified bonds. See sec. 141(e).

The term "private activity bond" means any bond that is part of an issue which meets: (1) The private business use test of section 141(b)(1) and the private security or payment test of section 141(b)(2), or (2) which meets the private loan financing test of section 141(c). Sec. 141(a). The parties agree that the only issue in the instant case is whether the proposed bonds meet the private business use test and the private security or payment test (collectively the private business tests). If the private business tests are met, the bonds are private activity bonds. See sec. 141(a)(1); City of New York v. Commissioner, 103 T.C.

_____

[11]Under sec. 7478, the Tax Court shall have jurisdiction, in a case of actual controversy involving a determination by the Secretary, to make a declaration whether interest on proposed bonds will be excludable from gross income under sec. 103(a). The burden of proof is on petitioner as to the grounds set forth in respondent's notice of determination and is on respondent as to any ground upon which he relies and which is not stated in the notice of determination. Rule 217(c)(2)(A) and (B); City of New York v. Commissioner, 103 T.C. 481, 482 (1994), affd. 70 F.3d 142 (D.C. Cir. 1995). Our decision in this case is based upon the administrative record and the stipulation of facts. Rule 217(a); City of New York v. Commissioner, supra at 482. We assume that the facts represented in the administrative record and in the stipulations are true. Rule 217(b)(1); City of New York v. Commissioner, supra at 482.

481, 498 (1994), affd. 70 F.3d 142 (D.C. Cir. 1995); sec. 1.141-2(c), Income Tax Regs.[12]

Section 141(b)(1) provides that an issue meets the "private business use test" if more than 10 percent of the proceeds of the issue are to be used for any private business use. "Private business use" means use (directly or indirectly) in a trade or business carried on by any person other than a governmental unit. The use of the bond proceeds by all nongovernmental persons is aggregated to determine whether the private business use test is met. Sec. 1.141-3(a)(3), Income Tax Regs. However, use as a member of the general public is not taken into account.[13] Sec. 141(b)(6)(A). For purposes of this test, the use of financed property is treated as the direct use of proceeds. Sec. 1.141-3(a)(1), Income Tax Regs. Both actual and beneficial use by a nongovernmental person may be treated as private business use. Sec. 1.141-3(b)(1), Income Tax Regs. Any use other than a private business use is considered a government use. Sec. 141(b)(7).

---

[12]Bonds are private activity bonds if the issuer reasonably expects, as of the issue date, that the bonds will meet the private business tests. Sec. 1.141-2(d)(1), Income Tax Regs. This inquiry takes into account reasonable expectations about events and actions over the entire stated term of an issue. Sec. 1.141-2(d)(2), Income Tax Regs.

[13]Use of financed property by the general public does not prevent bond proceeds from being used for a private business use because of other use. Sec. 1.141-3(c)(4), Income Tax Regs.

The "private security or payment test" of section 141(b)(2) relates to the nature of the security for, and the source of, the payment of debt service on a bond issue. Sec. 1.141-4(a), Income Tax Regs. This test is met if the payment of the principal of, or the interest on, more than 10 percent of the proceeds of the bond issue is directly or indirectly: (1) Secured by any interest in property used or to be used for a private business use, or payments in respect of such property, or (2) to be derived from payments (whether or not to the issuer) in respect of property, or borrowed money, used or to be used for a private business use. Sec. 141(b)(2).[14]

The regulations under section 141 provide special rules to determine whether arrangements for the purchase of output from an "output facility" cause an issue of bonds to meet the private business tests. Sec. 1.141-7(a), Income Tax Regs.[15] The term

_____

[14]Payments taken into account as private payments and payments or property taken into account as private security are aggregated. Sec. 1.141-4(a)(2), Income Tax Regs. However, the same payments are not taken into account as both private security and private payments. Id.

[15]The parties' arguments on brief cite the temporary regulations published on Jan. 18, 2001 (66 Fed. Reg. 4661), and effective Jan. 19, 2001. After the filing of briefs in this case, final output facility regulations were promulgated and are generally effective with respect to bonds sold on or after Nov. 22, 2002. See sec. 1.141-15(f)(1), Income Tax Regs. The provisions in the temporary regulations that the parties rely upon and the provisions in the final regulations do not differ in any material respect. For convenience, we cite the final regulations in this opinion.

"output facility" is defined as "electric and gas generation, transmission, distribution, and related facilities, and water collection, storage, and distribution facilities." Sec. 1.141-1(b), Income Tax Regs. If the output facility regulations apply, any output contract must be analyzed under section 1.141-7(c), Income Tax Regs., which identifies those contracts that have the effect of transferring substantial benefits of owning the bond-financed facility and substantial burdens of paying the debt service on bonds used to finance the facility (the benefits and burdens test). The general regulations under section 141(b)(1) and (2), see secs. 1.141-3 and 1.141-4, Income Tax Regs., then apply to determine whether other types of arrangements for use of an output facility cause an issue to meet the private business tests, sec. 1.141-7(a), Income Tax Regs.

B.  Private Business Tests

We must decide whether the proposed bonds meet the private business use test of section 141(b)(1). If that test is met, we must then decide whether the proposed bonds meet the private payment or security test of section 141(b)(2). Our primary focus is on whether Company's arrangement with petitioner results in a

private business use of the financed pipeline.[16]  Our resolution of the issues presented represents a matter of first impression.

1.    Arguments of the Parties

Respondent determined that petitioner's arrangement with Company conveys priority rights to the capacity of the pipeline and results in private business use of more than 10 percent of the bond proceeds under section 141(b)(1).  Respondent also determined that payments received from the sewage ratepayers are private payments that represent more than 10 percent of the debt service on the bonds under section 141(b)(2).

Petitioner argues that the only purpose for constructing the pipeline is the governmental purpose of sewage disposal.  It contends that the arrangement with Company does not involve any use by Company of the financed pipeline and that Company uses only the wastewater that is disposed of through that pipeline. Petitioner contends that Company's use of the wastewater begins only when the disposal function of the pipeline is completed and Company takes responsibility for the waste byproduct.  Petitioner argues, in the alternative, that, if Company's arrangement is

_____

[16]Respondent addresses his determination and his contentions on brief to Company's arrangement with petitioner.  He does not rely on the arrangements with the irrigators.  Payments from the irrigators will not exceed 5 percent of the debt service on the proposed bonds.  Further, as we discuss below, the sewage ratepayers use the pipeline as members of the general public. Therefore, their use cannot cause the pipeline to be private business use property.

determined to be a "use" of the pipeline: (1) The use is incidental to petitioner's governmental use and is not a special legal entitlement or special economic benefit, see sec. 1.141-3(b)(7)(i) and (ii), Income Tax Regs., that results in private business use; or (2) Company's arrangement should be analyzed under the output facility regulations as an output contract.

With respect to the application of the output facility regulations, petitioner argues that the financed pipeline is an output facility. Petitioner contends that the pipeline is a water facility since it distributes wastewater to Company and the irrigators. Accordingly, petitioner argues that Company's arrangement with petitioner should be analyzed under the output facility regulations. Petitioner contends that the arrangement with Company will not have the effect of transferring the substantial burdens of paying debt service on the proposed bonds since Company pays nothing for the wastewater.

Respondent determined that the bond-financed pipeline is "an integral part of the City's sewage system" and is not a water facility and that the term "output facility" does not include "facilities for the disposal of treated wastewater." He agrees with petitioner's primary contention (in the context of the private business use test) that the pipeline carries out the sewage function of petitioner's sewage system, it provides for the final disposal of wastewater, it was not built to provide

water to Company, and the wastewater is merely a byproduct of the sewage system.

2.   Sewage Ratepayers

We first decide whether the sewage ratepayers use the pipeline as members of the general public, since this determination is relevant in deciding whether the private business tests are met.  Under section 141(b)(6)(A), use as a member of the general public is not considered a private business use.  Use of financed property by nongovernmental persons in their trades or businesses is treated as general public use only if the property is intended to be available, and in fact is reasonably available, for use on the same basis by natural persons not engaged in a trade or business.  Sec. 1.141-3(c)(1), Income Tax Regs.

Petitioner argues that the use by the sewage ratepayers involves general public use, that their use is excepted from the definition of private business use, and that such use is not taken into account for purposes of section 141(b)(1).  Respondent made no determination as to whether the use by the sewage ratepayers represents general public use.  Further, on brief, respondent states that he has never considered whether the use by the sewage ratepayers involves general public use, because whether those ratepayers are using the pipeline as members of the

general public has no bearing on Company's private business use of that property.

The sewage ratepayers' use of the pipeline is based on removing and ultimately disposing of their sewage and is also based on their residence within the service area of the sewage system. There are no specially negotiated rate arrangements with the sewage ratepayers for the disposal of their sewage. See sec. 1.141-3(c)(2), Income Tax Regs. Ordinances set uniform and standardized sewer rates and connection fees for all users in the service area of the sewage system. The sewage disposal functions of petitioner's sewage system are available for general public use. We hold that the sewage ratepayers' use of the pipeline constitutes general public use.

3. Use of the Pipeline

Respondent's determination considered three users and two different uses of the financed pipeline:

> The City Project is used by Company, the irrigators, and the ratepayers. Use of the City Project by the ratepayers is based on removing and ultimately disposing of their sewage. In contrast, use of the City Project by the Company and the irrigators is based on supplying the wastewater for use in the geyser field or on irrigable property.

He relies solely on Company's purported use of the financed pipeline and concludes that such use is a private business use of more than 10 percent of the proceeds of the bond issue. For the reasons stated below, we disagree.

First, we cannot agree that Company's arrangement to receive and to dispose of wastewater represents a private business use of the financed pipeline. It is respondent's position in the context of the output facility regulations that the pipeline's purpose is the disposal of wastewater, that it is an integral part of petitioner's sewage facilities, and that it is not a facility which distributes water. Indeed, in respondent's reply brief at 32, he states that "the Contract with the Company is not an arrangement for the purchase of output, but rather was entered for the purpose of disposing of the Wastewater." Also, in his reply brief at 35 n.12, he states that "Rather than meeting the definition of an output facility, the Pipeline Project may meet the definition of a sewage facility [in section 142(a)(5) and section 1.142(a)(5)-1(a)(iv), Income Tax Regs.] in that it is property used for the collection, storage, use, processing, or final disposal of wastewater." If the purpose of the pipeline is waste removal and if it is a sewage facility that is used for the disposal of wastewater, Company's use of the wastewater would begin after the pipeline's sewage disposal purpose was completed.

The only use involved in Company's arrangement with petitioner is the use of a set amount of wastewater from the pipeline. However, the wastewater is not financed property, and respondent agrees that the wastewater is merely a waste byproduct of petitioner's sewage facilities. Company's use of the

wastewater begins after the pipeline's disposal process is complete. Disposal of wastewater is petitioner's only purpose for constructing the pipeline. We cannot agree that Company's use of what respondent terms "Wastewater", and suggests is waste, involves a use of the financed pipeline when petitioner's sole purpose for constructing the pipeline was to dispose of the wastewater. Company simply provides petitioner with a place in which to dispose of a certain amount of wastewater in an environmentally acceptable manner and, in turn, gets rights to that wastewater. In the circumstances of this case, Company's role in the disposal of the wastewater does not translate into a use of the sewage facilities.

Petitioner contends that, regardless of whether Company's use of the wastewater can be construed semantically as some use of the pipeline, any such use of the pipeline is not a private business use because taking the wastewater from the pipeline is incidental to the governmental sewage treatment and disposal purpose of that facility.[17] Petitioner relies upon the following

---

[17]Petitioner claims that from its perspective, "it is irrelevant who takes the Treated Water and what they do with it so long as the Treated Water is used in an environmentally sound manner in accordance with applicable law and relevant public policy." Petitioner adds that if it could accomplish its governmental purpose of sewage treatment and disposal by simply emptying the wastewater into a lake or pit at the top of the mountain, the cost of the pipeline would be the same and the sewage ratepayers would still be paying increased rates for the disposal of the wastewater.

- 20 -

statements in the Staff of Joint Comm. on Taxation, General

Explanation of the Tax Reform Act of 1986, at 1152 (J. Comm.

Print 1987), which discuss the reasons for the enactment of the

private business use test:

> Congress believed that * * * [the] diversion of
> governmental bond proceeds to nongovernmental users
> should be limited, but without setting the threshold
> amount so low that de minimis or incidental usage of
> government facilities and services by private users
> might cause interest on an issue to be taxable.
> [Emphasis added.]

In response to petitioner's contentions respondent argues

that "A legitimate governmental purpose cannot negate

impermissible private business use."  He suggests that uses of a

bond-financed facility that are incidental to its governmental

purpose are taken into account under the private business use

test and that neither the Code nor the regulations provides a

general exception for incidental use.  He argues that the

references to the terms "incidental" and "de minimis" in the

General Explanation, which petitioner relies upon, "simply refer

to amounts of private business use that fall below the statutory

threshold established by Congress"; i.e., private business use

which is less than 10 percent of the proceeds of an issue of

bonds.

First, we agree with respondent that neither the Code nor

the regulations provide a general exception for incidental use of

proceeds or financed property, except for the 10-percent

statutory threshold and the specific exceptions under the

regulations.[18]   Indeed, in the paragraph following the language

that petitioner relies upon in the General Explanation, the Staff

of the Joint Committee states at 1152:

> "To accomplish this, the Act generally defines as
> a private activity (i.e., nongovernmental) bond any
> bond of which more than 10 percent of the proceeds is
> to be used in a trade or business of any person or
> persons other than a governmental unit".  [Emphasis
> added.]

The statute, as finally enacted, demonstrates that the intended

exception of de minimis and incidental usage was accomplished, at

least in part, with the implementation of the 10-percent

threshold.[19]   Nevertheless, this does not indicate, as respondent

---

[18]See sec. 1.141-3(b)(4)(iii)(A), Income Tax Regs., which
excepts arrangements from the definition of a management contract
if they are "solely incidental to the primary governmental
function or functions of a financed facility"; sec. 1.141-
3(d)(2), Income Tax Regs., which excepts use incidental to
financing arrangements; and sec. 1.141-3(d)(5), Income Tax Regs.,
which provides that incidental uses of a financed facility are
disregarded to the extent that those uses do not exceed 2.5
percent of the proceeds used to finance the facility.

[19]Sec. 103(b)(2)(A) of the 1954 Code employed a trade or
business test similar to the private business use test in sec.
141(b)(1).  That provision prohibited private business use
involving a "major portion" of bond proceeds.  Regulations under
that section provided that use of more than 25 percent of bond
proceeds represented use of a "major portion".  Sec. 1.103-
7(b)(3)(iii), Income Tax Regs., 37 Fed. Reg. 15487 (Aug. 3,
1972).  The Senate amendment preceding the enactment of the Tax
Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, proposed to
amend sec. 103(b)(2)(A) to incorporate this 25-percent threshold.
However, the 10-percent threshold was ultimately adopted.  H.
Conf. Rept. 99-841 (Vol. II), at II-687 (1986), 1986-3 C.B. (Vol.
4) 1, 687.

suggests, that the characterization of use as incidental to the overall governmental purpose of a financed facility has no relevance. On the contrary, we believe this characterization has relevance not only in determining whether a particular arrangement or special economic benefit constitutes private business use, but also in determining whether such a use of proceeds or financed property exceeds the 10-percent threshold.

The regulations provide a list of the circumstances under which a nongovernmental person is treated as a private business user of proceeds and financed property. The list includes ownership, leases, management contracts, output contracts, and research agreements. See sec. 1.141-3(b)(2) through (6), Income Tax Regs. The regulations also identify a catch-all category: "Any other arrangement that conveys special legal entitlements for beneficial use of bond proceeds or of financed property that are comparable to the special legal entitlements" listed above. Sec. 1.141-3(b)(7)(i), Income Tax Regs.

Respondent determined that Company's reservation of a certain capacity of wastewater from the pipeline is a special legal entitlement for the use of that facility. He relies on section 1.141-3(b)(7)(i), Income Tax Regs., and contends that the priority rights that Company has under its contract with petitioner are comparable to those arrangements listed in the regulations. Specifically, he relies on the example contained in

the flush language of section 1.141-3(b)(7)(i), Income Tax Regs., which provides that "an arrangement that conveys priority rights to the use or capacity of a facility generally results in private business use."

Petitioner argues that its contract with Company does not fall into any of the categories of special legal entitlements listed in section 1.141-3(b)(2) through (6), Income Tax Regs. Further, petitioner contends that this contract is not comparable to any of those arrangements for purposes of section 1.141-3(b)(7)(i), Income Tax Regs., except output contracts. If the arrangement is comparable to an output contract, then petitioner argues that the output facility regulations should apply. We agree with petitioner.

Company does not have any rights which involve, or are comparable to, the ownership, leasing, or management of financed property.[20] Company's arrangement provides only rights to receive the wastewater that is disposed of through the pipeline. The only arrangement, of those listed in the regulations, to which we might conceivably view Company's rights to be comparable

---

[20]Par. (b)(2) of sec. 1.141-3, Income Tax Regs., targets ownership of financed property; par. (b)(3) targets leases of financed property; par. (b)(4) targets management contracts for services involving all, a portion of, or any function of, a facility; par. (b)(6) targets research agreements provided the nongovernmental sponsor of the research is treated as the lessee or owner of the financed property for Federal income tax purposes.

is an output contract.  See sec. 1.141-3(b)(5), Income Tax Regs.

However, respondent determined that Company's contract with

petitioner is not an output contract, and the pipeline is not an

output facility.  Indeed, respondent argues on brief that "The

Contract with the Company is not an arrangement for the purchase

of output, but rather was entered for the purpose of disposing

[of] the Wastewater."  Given respondent's position and his

agreement that the pipeline is a sewage facility, we cannot agree

that Company's rights are comparable to an output contract or any

of the arrangements listed in the regulations.  We cannot agree

that Company has any special legal entitlements with respect to

the financed pipeline.  Company simply receives the waste product

that petitioner disposes of through that facility.

Respondent also argues for the first time on brief that the

private business use test is met because the facts and

circumstances establish that Company receives a special economic

benefit with respect to the financed pipeline.  In most cases,

the private business use test is met only if a nongovernmental

person has special legal entitlements to use the financed

property under an arrangement with the issuer.  Sec. 1.141-

3(b)(1), Income Tax Regs.  However, section 1.141-3(b)(7)(ii),

Income Tax Regs., provides a special rule for facilities that are

not used by the general public:

>    (ii)  <u>Special rule for facilities not used by the
> general public</u>.  In the case of financed property that

is not available for use by the general public (within the meaning of paragraph (c) of this section), private business use may be established solely on the basis of a special economic benefit to one or more nongovernmental persons, even if those nongovernmental persons have no special legal entitlements to use of the property. In determining whether special economic benefit gives rise to private business use it is necessary to consider all of the facts and circumstances, including one or more of the following factors--

    (A) Whether the financed property is functionally related or physically proximate to property used in the trade or business of a nongovernmental person;

    (B) Whether only a small number of nongovernmental persons receive the special economic benefit; and

    (C) Whether the cost of the financed property is treated as depreciable by any nongovernmental person.

Respondent contends that this special rule is met in this case because "the Pipeline Project is not available for use on the same basis by persons not engaged in a trade or business. Treas. Reg. § 1.141-3(c)(1)." We disagree.

The pipeline is available for use by members of the general public. The pipeline is an integral part of petitioner's sewage system. The sewage ratepayers use the sewage system, including the pipeline, as members of the general public. They use that system to dispose of their sewage, and they pay what the record reflects to be uniform and standardized rates set by ordinance. There are no specially negotiated rate arrangements, and all

users of the pipeline for sewage disposal appear to use that facility on a generally equivalent basis.

Respondent seems to suggest that we focus on Company's particular use, i.e., its use of the wastewater from the pipeline, and whether members of the general public use the wastewater on the same basis as Company. We do not believe that is the appropriate inquiry under section 1.141-3(b)(7)(ii), Income Tax Regs. This special rule focuses on whether the financed pipeline is available for use by the general public. We conclude that it is since the sewage ratepayers' sewage disposal use is as members of the general public. Their use is unobstructed by any incidental use and rights that Company may have to the wastewater following its disposal through the pipeline. Accordingly, section 1.141-3(b)(7)(ii), Income Tax Regs., does not apply, and the special economic benefit that Company receives from the pipeline is not sufficient alone to give rise to a private business use.

Even if we were to assume that petitioner's arrangement with Company is a private business use of the pipeline, respondent's determination raises significant questions as to whether such use exceeds 10 percent of the bond proceeds. Respondent determined:

> In this case, one requirement imposed by Company is that approximately C gallons of wastewater be delivered each day to the geyser field during the term of the Contract. This represents a reservation of about 27% of the capacity of the Multi-Use Pipeline and nearly 100% of the Geyser Field Pipeline. This special

legal entitlement of Company, a nongovernmental person, causes City Project to be privately used in the trade or business of Company. Because more than 10% of the Bond proceeds will be used by a nongovernmental person in its trade or business, the private business use test of § 141(b)(1) will be met if the Bond proceeds are used as proposed.

Section 141(b)(1), the regulations thereunder, and the legislative history indicate that only private business use, alone or in the aggregate, which exceeds 10 percent of the proceeds of the bond issue causes the private business use test to be met. It is clear that section 141(b)(1) requires a quantification or a valuation of the private business use(s) for purposes of determining whether such use exceeds this threshold.

The regulations provide a methodology for measuring private business use of financed property. The amount of private business use is determined according to the average percentage of private business use of financed property during the measurement period. Sec. 1.141-3(g)(1), Income Tax Regs. In general, the measurement period begins on the later of the issue date of the bond issue or the date the property is placed in service and ends on the earlier of the last date of the reasonably expected economic life of the property or the latest maturity date of any bond of the issue financing the property. Sec. 1.141-3(g)(2)(i), Income Tax Regs. The average percentage of private business use is the average of the percentage of private business use during

the 1-year periods within the measurement period.  Sec. 1.141-3(g)(3), Income Tax Regs.

In general, the percentage of private business use of property for any 1-year period is the average private business use during that year.  Sec. 1.141-3(g)(4)(i), Income Tax Regs. This average is determined by comparing the amount of private business use and use that is not private business use (government use) during that year.  Id.  In the case of a facility in which actual government use and private business use occur at different times, the average amount of private business use generally is based on the amount of time that the facility is used for private business use as a percentage of the total time for all actual use.  Sec. 1.141-3(g)(4)(ii), Income Tax Regs.  In the case of a facility in which government use and private business use occur simultaneously, the entire facility is generally treated as having private business use.  Sec. 1.141-3(g)(4)(iii), Income Tax Regs.  If, however, there is also private business use and actual government use on the same basis, the average amount of private business use may be determined on a reasonable basis that properly reflects the proportionate benefit to be derived by the various users of the facility (for example, reasonably expected fair market value of use).  Id.

Respondent fails to explain in his determination how a reservation of a certain capacity of wastewater disposed of

through the pipeline translates into a use of more than 10 percent of the bond proceeds. However, on brief, he seeks to explain his position. He contends that petitioner's governmental use and Company's purported private use of the pipeline occur simultaneously. Accordingly, he claims that the entire pipeline is treated as used in a private trade or business under section 1.141-3(g)(4)(iii), Income Tax Regs. We disagree.

First, even if we were to assume that Company uses the pipeline, we cannot agree that petitioner's governmental use and Company's private use would be simultaneous. Petitioner uses the pipeline to dispose of the wastewater it generates as a byproduct of its sewage system. Its use commences at its existing sewage facilities and ends at the point-of-delivery connection. Company, on the other hand, has agreed to assist petitioner in disposing of a set amount of the wastewater. In exchange, Company will have rights to use that amount of wastewater at the point-of-delivery connection. Only then will Company commence its use of the wastewater. We cannot agree that these circumstances establish a simultaneous use. Any use by Company of the pipeline is incidental and does not occur at the same time as petitioner's disposal use.[21]

---

[21]If we were to characterize the pipeline in a different manner than the way respondent characterized that facility in the context of the output facility regulations, we might characterize the financed pipeline as performing a dual function. It disposes
(continued...)

Respondent's attempts to quantify or value Company's purported use of the pipeline in terms of a reservation of the capacity of the pipeline are unavailing.  We cannot agree with respondent that his analysis represents a rational measurement of Company's alleged use of the pipeline.  In his attempt to quantify or value Company's alleged use of the pipeline, respondent fails to account for the sewage ratepayers' use of the pipeline to dispose of their sewage.  Nevertheless, in other parts of his determination he relies upon the sewage ratepayers' use of the pipeline.  Further, respondent's attempt at measuring Company's use is not reconcilable with his characterization of the pipeline as a sewage facility which was constructed for the purpose of wastewater disposal.  His measurement fails to account for the presence of this governmental purpose, and, instead, relies solely on what he views as a reservation of the capacity of the pipeline.  We cannot agree that a reservation of what respondent agrees is a waste byproduct of petitioner's sewage

---

[21](...continued)
of the wastewater that is produced as part of petitioner's sewage system, and it distributes water to Company for use in its electricity operations.  However, that is not the characterization that respondent advocates in this case.  On the contrary, he suggests that the pipeline's purpose is waste removal and that it does not perform a water distribution function.

facilities equates with a use of 27 to 100 percent of the pipeline facility which disposes of such waste.[22]

Given the circumstances of this case and the arguments of the parties, the more appropriate view is that Company does not use the financed pipeline in any quantifiable amount, and, certainly, not in an amount in excess of 10 percent of the bond proceeds.  In support of this view, we note that Company pays nothing to petitioner for its purported use of the financed pipeline, or, for that matter, the wastewater.  Company simply agrees to dispose of the wastewater that it receives, and in exchange it is given rights to use the water in its electricity operations.  The sewage ratepayers, on the other hand, will pay fees for the disposal of their sewage which will amount to at least 95 percent of the debt service on the bonds used to finance the pipeline.  This, in our view, indicates that at least 95 percent of the financed pipeline will be used for sewage disposal.  This represents a more accurate reflection of the use of the pipeline than respondent's determination that more than 10 percent of the pipeline will be used by Company.

---

[22]Also, we note that sec. 1.141-3(d)(5), Income Tax Regs., excepts incidental uses of a financed facility which do not exceed 2.5 percent of the proceeds used to finance the facility. In responding to the potential application of that provision, respondent states without explanation that the latter provision does not apply "in light of the extensive rights the Company has with respect to the capacity of the Pipeline Project."

We hold that the private business use test is not met. Accordingly, the proposed bonds will not be private activity bonds.[23]  Interest on those bonds will be excludable from gross income under section 103(a).

<u>Decision will be</u>

<u>entered for petitioner</u>.

---

[23]A bond issue meets the private business tests of sec. 141(b) if it meets <u>both</u> the private business use test and the private security or payment test.  <u>City of New York v. Commissioner</u>, 103 T.C. at 498.  Because the bond issue in the instant case fails to meet the private business use test, it is unnecessary for us to discuss whether the private security or payment test is met.