T.C. Memo. 2015-191

UNITED STATES TAX COURT

FRED COOPER AND JENNIFER L. BRADY, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6789-13.                    Filed September 28, 2015.

<u>Marion K. Mortensen</u> and <u>Blaine D. Williams</u>, for petitioners.

<u>Mark Hale Howard</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, <u>Judge</u>:  Fred Cooper lent money to friends and acquaintances.  One

such loan was to Wolper Construction, Inc., a real estate development business run

by an acquaintance.  After that business encountered financial difficulties, Mr.

Cooper and Jennifer Brady filed an amended 2008 return claiming a bad debt

deduction from the loan Mr. Cooper had made to Wolper Construction.  Mr.

**[*2]** Cooper was not engaged in lending as a business, and therefore the loan to Wolper Construction is a nonbusiness debt under section 166(d).[1] Under section 166, a taxpayer can claim a short-term capital loss for the year in which a nonbusiness debt becomes wholly worthless. Because Mr. Cooper and Ms. Brady have not proven that the loan became wholly worthless in 2008 or 2009, the years before the Court, they cannot deduct the loan as a bad debt for either of those years.

## FINDINGS OF FACT

I.    Background

Fred Cooper and Jennifer Brady, husband and wife, filed joint Forms 1040, U.S. Individual Income Tax Return, for years 2008 and 2009.

II.    Mr. Cooper's Primary Employment and Other Business Activities

Mr. Cooper was a full-time employee of USANA Health Sciences, Inc. (USANA), during the years in issue. During his 14 years at USANA Mr. Cooper served in different roles, including chief operations officer, chief information officer, and president.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[*3]** Mr. Cooper owns other business interests, including rental properties, a car wash, a search engine optimization company, a pheasant farm, and a drug manufacturing company. Mr. Cooper also has made sporadic loans.

Mr. Cooper lent money to friends and also to acquaintances referred to him by his friends Robert Potter and Scott Corry. People to whom he lent money include his secretary, his accountant and her employee, and two business associates. He lent money on a short-term basis and charged high interest rates. He described his lending activities as "hard-money loans", and lent money to people who might otherwise have had difficulty obtaining cash. At times he charged an annualized interest rate as high as 40%.

Mr. Cooper claimed he made at least 14 loans between 2006 and 2010, but according to the record he made 12 loans to 11 borrowers from 2005 to 2010. Mr. Cooper produced promissory notes for only five of those loans. Mr. Cooper knew five of the borrowers before making the loans, and the other six borrowers were introduced to him by his friends.

Mr. Cooper did almost none of the due diligence that would be customary in a lending business. He did not conduct credit checks or verify collateral through title searches, and he did not collect information through any loan applications before extending loans. He testified that he would "loan to individuals based on

[*4] their character and whether or not I believe that they have the ability and the willingness to repay. I really follow this motto. You can't make an immoral man moral with a contract or the vice vers[a] is also true."

Mr. Cooper claimed he devoted between 150 and 200 hours in 2006 to his lending activities and between 120 and 150 hours each year from 2007 forward, in addition to the time he spent in his primary job at USANA and in his other business activities, a claim that we do not find credible. His estimate would have him spending upwards of 50 hours per loan despite performing virtually no due diligence and evidence that he did not know what was paid or owed.[2]

III.    Wolper Construction Loan

Richard Wolper was the president of Wolper Construction, which performed infrastructure, sewer, water, road, and pipeline construction. Mr. Wolper also owned interests in various real estate development companies, for some of which Wolper Construction guaranteed loans.

Mr. Cooper lent money to Mr. Wolper for the first time in 2005 following an introduction by their common friend, Robert Potter. The loan was $500,000 for

---

[2]On March 3, 2011, in response to questions from his accountant about a loan, Mr. Cooper emailed his accountant: "No-one knows the exact balance. You're the best guesser of it. Please give us your guess and we will have him document the balance and new schedule."

**[*5]** six months and was timely repaid in 2006 with approximately $89,000 in interest. Mr. Cooper did not report this interest income on his 2006 Form 1040.

In March 2006 Mr. Cooper made a second loan to Wolper Construction. The promissory note that Mr. Wolper and Mr. Cooper signed reflected a principal amount of $750,000 and a maturity date of September 29, 2006, but the record remains unclear whether Mr. Cooper lent the full amount.[3] The promissory note included a collateral guaranty in the form of a deed of trust on real property owned by Wolper Construction; however, no lien was recorded, and Mr. Wolper testified that he did not believe any deed of trust was ever created.

In October 2006 Mr. Cooper extended the March 2006 loan for an additional six months. Mr. Cooper and Mr. Wolper signed a successor promissory

---

[3]The parties agree that Mr. Cooper lent Wolper Construction $550,000. The record is less clear on the remaining $200,000. There were many inconsistencies as to whether Mr. Cooper or Mr. Potter provided the $200,000. Mr. Potter signed a check for $175,000 and a check for $25,000 drawn on one of his bank accounts on different days. Both Mr. Cooper and Mr. Potter claimed that Mr. Potter gave Wolper Construction this $200,000 on Mr. Cooper's behalf and Mr. Cooper reimbursed Mr. Potter; however, neither Mr. Cooper nor Mr. Potter has any documents to support this assertion. Further, Mr. Cooper initially emailed that the two checks totaling $200,000 were for a loan made to someone else, not Wolper Construction. When asked, Mr. Cooper claimed he was confused and had made a mistake.

[*6] note[4] for $925,000 which reflected an unpaid $750,000 principal plus the interest due.

In April 2007 when the $925,000 came due, Wolper Construction did not pay. Mr. Cooper testified that at the time he "wasn't too concerned yet that it wouldn't be paid."

Wolper Construction filed a chapter 11 bankruptcy petition on June 23, 2008. The bankruptcy estate's schedules initially reported assets of $62,480,203 and liabilities of $34,571,185 in July 2008 and later reported assets of $61,180,203 and liabilities of $26,698,931 on its amended schedules filed in August 2008. Mr. Cooper never filed a proof of claim with the bankruptcy court against the bankruptcy estate.

Twice during the first months of 2009 Mr. Cooper reported the Wolper Construction note as an asset. On a loan application in February 2009 he valued the Wolper Construction note at $1,400,000, and on an April 2009 personal financial statement he valued it at $1,200,000.

---

[4]The original $750,000 promissory note due September 29, 2006, indicated Fred Cooper was the lender, but the second promissory note for $925,000 indicated Cooper Lending was the lender.

[*7] IV.    Conversion of the Bankruptcy Proceeding to Chapter 7

On February 23, 2009, Affinity Bank filed a proof of claim against the bankruptcy estate for $42,473,310.  Affinity Bank asserted its claim on the basis of a guaranty that Wolper Construction had made on behalf of Fox Hollow Saratoga, LLC.

On May 5, 2009, Affinity Bank filed a motion to convert the bankruptcy proceeding into a chapter 7 case.  In support of this motion, Affinity Bank claimed that a mechanic's lien that was an asset of the bankruptcy estate was overvalued, that the bankruptcy estate was currently operating with negative cashflows, and that the bankruptcy estate's liabilities should have included the Fox Hollow Saratoga guaranty.  Around this same time the bankruptcy estate reported a positive net worth ranging from $7,272,750 to $37,182,331.  The bankruptcy court granted this motion on September 21, 2009, and converted the proceedings to a chapter 7 case.

The true value of the mechanic's lien was determined in 2010 when the bankruptcy court authorized it to be sold.  Sometime after April 27, 2010, the lien

[*8] was sold for $116,000, a fraction of what it had been valued at on the previous bankruptcy schedules.[5] The bankruptcy proceedings were closed in August 2013.

V.      Recordkeeping and Return Filing

Mr. Cooper did not keep contemporaneous records for his loan activities, and the few records he did keep were incomplete. Some of the loans had promissory notes, and others did not. Mr. Cooper's accountant admitted to constructing the loan records after the fact. The accountant contacted borrowers to inquire about the loan terms, how many payments they had made, and what amounts they believed they still owed Mr. Cooper. The accountant also used bank statements to reconcile payments and deposits, but she did not receive these bank statements until sometime in late 2009 or 2010.

Mr. Cooper did not report the Wolper Construction loan on the 2008 return that he filed jointly with Ms. Brady on October 15, 2009. He claimed that he had been traveling when his accountant sent him the return to approve and that he had told her that it was missing a deduction for the Wolper Construction loan. He further claimed she had told him that they could amend the return to include this

---

[5]The mechanic's lien was reported as an asset of $36,523,913 on the bankruptcy schedules from July 2008.

[*9] bad debt at a later date. Mr. Cooper and Ms. Brady filed amended returns reporting the bad debt in April 2010.

Mr. Cooper's accountant claimed her accounting firm had mailed Wolper Construction a Form 1099-C, Cancellation of Debt, and had mailed the Internal Revenue Service (IRS) a Form 1096, Annual Summary and Transmittal of U.S. Information Returns, for a $750,000 bad debt. The accountant did not provide proof of mailing, and the IRS has no record of receiving the Form 1096.

VI.    Audit and Tax Court Proceeding

The IRS audited Mr. Cooper and Ms. Brady's 2008 and 2009 tax returns and issued a notice of deficiency for tax years 2008 and 2009 on January 22, 2013. That notice made various adjustments to the original returns for those years. The IRS did not process the 2008 amended individual return Mr. Cooper and Ms. Brady filed in April 2010 and on which they claimed a business bad debt deduction for the Wolper Construction loan of $750,000 and claimed a refund.

Mr. Cooper and Ms. Brady resided in Utah when they timely petitioned the Court. Mr. Cooper and Ms. Brady alleged in their petition that the IRS erred in not allowing the bad debt deduction of $750,000 from the Wolper Construction loan for 2008. In his answer respondent asserted additional unreported income and a related penalty under section 6662. The parties reached an agreement on

**[*10]** this unreported income issue which is reflected in a stipulation of settled issues they filed with the Court.

Trial was held in Salt Lake City, Utah. Mr. Cooper and Ms. Brady did not dispute the issues raised in the notice of deficiency and argued only that the bad debt deduction of $750,000 for 2008 should be allowed. They moved to amend their petition to conform the pleadings to the evidence presented at trial, arguing in the alternative that they should be allowed a bad debt deduction for tax year 2009. Respondent opposed the motion.

The parties agree that the only remaining issue we must decide is whether Mr. Cooper and Ms. Brady are entitled to the bad debt deduction of $750,000.

OPINION

I.   <u>Burden of Proof</u>

Taxpayers generally have the burden of proof.[6] In limited situations the burden may shift to the Commissioner under section 7491(a), but there is insufficient information in the record to conclude that the burden should shift under section 7491(a), and Mr. Cooper and Ms. Brady do not argue that the burden should shift. Accordingly, the burden remains on them.

---

[6]Rule 142(a).

**[\*11]** Income tax deductions are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any claimed deduction.[7] Further, the taxpayer is required to maintain sufficient records to "show whether or not such person is liable for tax".[8]

II.     Section 166 Bad Debt Deduction

Section 166 allows taxpayers to deduct any debt that becomes worthless within the taxable year.[9] To be entitled to a deduction, the taxpayer must show a bona fide debt based on a debtor-creditor relationship.[10]

Business debts and nonbusiness debts are treated differently under section 166.[11] Nonbusiness debts are defined as debts other than "(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the

---

[7]INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); see also Rule 142(a).

[8]Sec. 6001.

[9]Sec. 166(a)(1).

[10]Sec. 1.166-1(c), Income Tax Regs.

[11]Cooper v. Commissioner, 143 T.C. 194, 216 (2014).

[*12] taxpayer's trade or business."[12]  Taxpayers must treat nonbusiness bad debts as losses from the sale or exchange of a short-term capital asset and can deduct the debt only for the year in which the debt becomes wholly worthless.[13]  However, business bad debts give rise to deductions that can be offset against ordinary income.[14]  Whether a debt is a business or nonbusiness debt is a question of fact,[15] and taxpayers "must show that the bad debt loss is 'proximately related' to the conduct of trade or business, or that the debt was created in the course of trade or business."[16]

Mr. Cooper and Ms. Brady argue that Mr. Cooper was in the business of lending and that the Wolper Construction loan is therefore fully deductible as a business loan.  Respondent disagrees and contends Mr. Cooper was not in the business of lending.

---

[12]Sec. 166(d)(2).

[13]Secs. 166(d)(1)(B), 1211(b), 1212(b); sec. 1.166-5(a)(2), Income Tax Regs.

[14]Sec. 166(a).

[15]Rollins v. Commissioner, 276 F.2d 368 (4th Cir. 1960), aff'g 32 T.C. 604 (1959); sec. 1.166-5(b), Income Tax Regs.

[16]Litwin v. United States, 983 F.2d 997, 999 (10th Cir. 1993).

**[*13]** A.    Not in Business of Lending

We have held that the "right to deduct bad debts as business losses is applicable only to the exceptional situations in which the taxpayer's activities in making loans have been regarded as so extensive and continuous as to elevate that activity to the status of a separate business."[17]  We look to various facts and circumstances to indicate whether a taxpayer is in the business of lending, such as:

> (1) The total number of loans made; (2) the time period over which the loans were made; (3) the adequacy and nature of the taxpayer's records; (4) whether the loan activities were kept separate and apart from the taxpayer's other activities; (5) whether the taxpayer sought out the lending business; and (6) the amount of time and effort expended in the lending activity; and the relationship between the taxpayer and his debtors. * * * [18]

Other indicators include whether the taxpayer used normal money-lending methods and practices, advertised, had a business office, had a business organization, had loan forms, and maintained business books.[19]

---

[17]Imel v. Commissioner, 61 T.C. 318, 323 (1973); Sales v. Commissioner, 37 T.C. 576 (1961); Barish v. Commissioner, 31 T.C. 1280 (1959).

[18]Scallen v. Commissioner, T.C. Memo. 2002-294, slip op. at 23-24; Serot v. Commissioner, T.C. Memo. 1994-532, aff'd without published opinion, 74 F.3d 1227 (3d Cir. 1995).

[19]Zivnuska v. Commissioner, 33 T.C. 226, 238 (1959).

**[\*14]** Each case is decided on its own particular facts and circumstances. In one bad debt case we determined that a taxpayer was not engaged in a separate lending business because he made only "eight or nine loans in the course of a 4-year period".[20] In contrast, different facts led us to conclude that a taxpayer who made 55 separate loans over a 10-year period was in the lending business, despite "inadequate and disorganized" records.[21] In the latter case we found that "lending money was clearly petitioner's primary business activity during the late 1970s and early 1980s. Petitioner devoted approximately 40 to 50 hours per week to his lending activities. Most of petitioner's working day was spent generating loans or collecting on loans already made."[22] An additional factor that led us to find that the taxpayer was in the business of lending was the "lack of any relationship between petitioner and those he lent money to".[23]

Mr. Cooper's activities lead us to conclude that he was not in the business of lending money for five reasons.

---

[20]Imel v. Commissioner, 61 T.C. at 323.

[21]Serot v. Commissioner, T.C. Memo. 1994-532.

[22]Serot v. Commissioner, T.C. Memo. 1994-532.

[23]Serot v. Commissioner, T.C. Memo. 1994-532.

**[*15]** First, Mr. Cooper made only 12 loans over a six-year period from 2005 to 2010. Lending was not a significant activity for him in terms of the time devoted. He was working full time and traveling extensively in the various executive jobs he performed for USANA during these years. By his own exaggerated account, the most time he devoted to lending was in 2006, and he claimed to have spent less than four hours per week that year and less in the years following.

Second, Mr. Cooper lent money to friends and acquaintances. He lent money to people he was acquainted with such as his secretary, his accountant and her employee, and two business associates. The other individuals or entities he lent money to were introduced to him by two of his friends.

Third, Mr. Cooper did not conduct his lending practices with typical business formalities. He did not perform credit checks or verify collateral value and ownership but rather based decisions on gut feeling and the comfort of friendship or the recommendations of friends. He did not execute promissory notes for 7 of the 12 loans he made. He never bothered to ensure that the trust deed mentioned in the Wolper Construction loan for $750,000 was ever created or filed. And he did not keep track of his loans or their balances.

Fourth, Mr. Cooper did not publicly hold himself out as being in the lending business. He did not advertise his lending services or actively seek new clients.

**[*16]** He did not maintain a separate office for his lending activity or maintain some other type of business presence such as a Web site.

Finally, Mr. Cooper did not keep adequate business records. The records produced at trial were not contemporaneous and were constructed after the fact. Many of the loan balances and payment records were compiled by the accountant after she asked the borrowers to help her determine what had been paid and what was still owed on the loans. The bank statement reconciliations performed by the accountant to prepare the loan activity records were done in late 2009 and in 2010, long after most of the loans were made. And Mr. Cooper did not timely report the loan activities on his returns for 2006, 2007, and 2008, waiting until April 2010 to file amended individual returns for these tax years.

On the basis of these facts and circumstances, we hold that Mr. Cooper was not in the business of lending, and accordingly the loans he made are nonbusiness debts under section 166(d)(2).

**[\*17]** B.     <u>Wolper Construction Loan Not Wholly Worthless in 2008 or 2009</u>

In order to deduct a nonbusiness bad debt, Mr. Cooper must show that the loan became wholly worthless in the year for which he claimed the deduction.[24]  It is he who bears the burden.[25]  Section 166 allows only wholly worthless nonbusiness debts to be deducted, and in order for a debt to be wholly worthless its "last vestige of value" must be gone.[26]  Taxpayers "must show sufficient objective facts from which worthlessness could be concluded; mere belief of worthlessness is not sufficient."[27]  If the debtor files a bankruptcy petition, the bankruptcy can be an indication that at least part of an unsecured debt is worthless; however, "[i]n bankruptcy cases a debt may become worthless before settlement in some instances; and in others, only when a settlement in bankruptcy has been reached."[28]

The Court's determination of worthlessness is a facts and circumstances test, and the taxpayer must show "identifiable events that form the basis of

---

[24]<u>See</u> sec. 1.166-5(a)(2), Income Tax Regs.

[25]<u>See</u> Rule 142(a); <u>Crown v. Commissioner</u>, 77 T.C. 582, 598 (1981).

[26]<u>Bodzy v. Commissioner</u>, 321 F.2d 331, 335 (5th Cir. 1963), <u>aff'g in part, rev'g in part</u> T.C. Memo. 1962-40.

[27]<u>Fincher v. Commissioner</u>, 105 T.C. 126, 138 (1995).

[28]Sec. 1.166-2(c), Income Tax Regs.

[*18] reasonable grounds for abandoning any hope of recovery."[29] The taxpayer's determination that the debt became wholly worthless "must be made in the exercise of sound business judgment, based upon as complete information as is reasonably obtainable."[30] A taxpayer's subjective opinion of worthlessness, standing alone, is not enough.[31]

Mr. Cooper did not establish that he had reasonable grounds to abandon any hope of recovery in 2008. In fact, his actions belie his assertion; he did not treat the loan as worthless in 2008 or in 2009. In February and April 2009 he listed the loan as an asset on a net worth statement. In October 2009 when he and Ms. Brady filed their 2008 tax return, they did not report the Wolper Construction loan as worthless. And while their accountant purportedly reported the loan as worthless to both Wolper Construction and the IRS, the record does not support that claim; there is no documentary evidence of when a Form 1099-C might have been sent to Wolper Construction, and the IRS has no record of receiving a Form

---

[29]Aston v. Commissioner, 109 T.C. 400, 415 (1997); see also Fincher v. Commissioner, 105 T.C. at 137-138; Dallmeyer v. Commissioner, 14 T.C. 1282, 1291-1292 (1950).

[30]Andrew v. Commissioner, 54 T.C. 239, 248 (1970).

[31]Fox v. Commissioner, 50 T.C. 813, 822 (1968) ("Mere belief that a debt is bad is insufficient to support a deduction for worthlessness".).

[*19] 1096 reporting the cancellation of indebtedness income for Wolper Construction. The first instance of Mr. Cooper's or those acting at his direction's treating the loan as worthless wasn't until 2010, when Mr. Cooper and Ms. Brady filed an amended return, retroactively treating the loan as worthless for 2008.

Mr. Cooper failed to show that he abandoned hope of recovery in 2008; but moreover, the evidence does not establish that the debt was wholly worthless at that time. The key is that the debt must be wholly worthless.[32] Mr. Cooper and Ms. Brady point to Wolper Construction's filing bankruptcy in June 2008 as proof, but this did not establish with reasonable certainty that the Wolper Construction debt was wholly worthless. Wolper Construction filed for chapter 11 reorganization and reported positive net worth on its bankruptcy schedules as of 2008.

Similarly, Mr. Cooper and Ms. Brady have not established that the debt was wholly worthless in 2009. Mr. Cooper and Ms. Brady point to speculation in the bankruptcy proceeding of asset overvaluation, claims of additional liabilities, and the conversion to a chapter 7 case as proof that the debt became wholly worthless in 2009. These allegations do not establish the values of the assets and liabilities

---

[32]See Bodzy v. Commissioner, 321 F.2d at 335; sec. 1.166-5(a)(2), Income Tax Regs.; see also, e.g., John v. Commissioner, T.C. Memo. 2004-257; Clanton v. Commissioner, T.C. Memo. 1995-416.

[*20] of the bankruptcy estate as of 2009. Therefore, Mr. Cooper and Ms. Brady have not met their burden of showing that the debt became wholly worthless in 2009.

As of the end of 2009 the value of the mechanic's lien was unknown. The mechanic's lien was the largest asset of the bankruptcy estate and had been reported on the original schedules with a value of approximately $36,500,000. It was not until 2010 that the value of the lien was known, which is also when Mr. Cooper and Ms. Brady first treated the debt as worthless (when they filed their amended return for 2008). Therefore, we hold that Mr. Cooper and Ms. Brady cannot deduct the Wolper Construction bad debt for 2008 or 2009.

III.   Posttrial Motion To Add 2009 to Petition Under Rule 41(b) Denied

After trial Mr. Cooper and Ms. Brady asked for leave to amend their petition under Rule 41(b). Specifically, they moved to amend their petition to add the alternative argument that the Wolper Construction loan became worthless in 2009 if the Court determined that it was not worthless in 2008. Respondent objected.

Rule 41(a) provides that after a responsive pleading is filed, the Court may grant leave to amend if the opposing party objects and that leave "shall be given freely when justice so requires." This reflects a liberal attitude that the parties should be given "the maximum opportunity for each claim to be decided on its

[*21] merits rather than on procedural niceties."[33]  However, the Supreme Court

has explained that leave to amend may not be warranted where there is "futility of

amendment".[34]  Rule 41(b)(1) provides:

> When issues not raised by the pleadings are tried by express or
> implied consent of the parties, they shall be treated in all respects as if
> they had been raised in the pleadings.  The Court, upon motion of any
> party at any time, may allow such amendment of the pleadings as may
> be necessary to cause them to conform to the evidence and to raise
> these issues, but failure to amend does not affect the result of the trial
> of these issues.

In determining whether leave to amend should be granted, we consider

whether the taxpayers would prevail on the merits.[35]  And we may deny a motion

to amend petition if allowing the amendment would be futile.[36]  In order to prevail

on the merits, Mr. Cooper and Ms. Brady must prove that the debt became wholly

worthless in 2008 or 2009, and they have not done so.  Therefore, we hold that

---

[33]Hardin v. Manitowoc-Forsythe Corp., 691 F.2d 449, 456 (10th Cir. 1982) (interpreting Fed. R. Civ. P. 15(a)).

[34]Foman v. Davis, 371 U.S. 178, 182 (1962) (interpreting Fed. R. Civ. P. 15(a)).

[35]Russo v. Commissioner, 98 T.C. 28, 31 (1992) (denying taxpayer's motion for leave to file amendment to petition where taxpayer would not prevail on her claim even if motion were granted).

[36]Block v. Commissioner, 120 T.C. 62, 64 (2003); Russo v. Commissioner, 98 T.C. at 31.

[*22] allowing them to amend their petition to add that the debt became wholly worthless in 2009 would be futile. Accordingly, we deny their motion to amend.

IV. Conclusion

Mr. Cooper and Ms. Brady seek a bad debt deduction for a loan Mr. Cooper made to Wolper Construction. Mr. Cooper was not engaged in lending as a business, and therefore the loan was a nonbusiness debt. For a taxpayer to deduct a nonbusiness bad debt, the loan must be wholly worthless. Mr. Cooper and Ms. Brady failed to prove that they had reasonable grounds to abandon any hope of recovery in 2008 or 2009, and the evidence does not establish that the loan became wholly worthless during either of those years. Accordingly, they cannot deduct the loan as a bad debt for 2008 or 2009.

To reflect the foregoing,

An appropriate order will be issued and decision will be entered under Rule 155.